# United States Court of Appeals
## For the First Circuit

---

No. 00-1234, 00-1342, 00-1343, 00-1344, 00-1345, 00-1399, 00-1400, 00-1401, 00-1402, 00-1403, 00-1404

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

WILLIAM M. DAVIS, et al.,

Defendant, Appellee.

---

ASHLAND, INC., et al.,

---

Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

---

Before

Lipez, Circuit Judge,

Zobel and Woodlock, District Judges.*

---

Denis V. Brenan for appellant Ashland, with whom Neal J. McNamara and Morgan, Lewis & Bockius LLP were on the brief; Gerald J. Petros for appellants Acco Bristol and Gar Electroforming Division, with whom Christopher R. Bush, Charles D. Blackman, and Hinckley, Allen & Snyder LLP were on the brief; Gregory L. Benik and Robin L. Main for appellants Morton International, Inc. and Perkin-Elmer Corporation, with whom Karen A. Mignone and McGovern Noel & Benik, Inc. were on the brief.

Robert E. Maher, attorney, U.S. Department of Justice, for appellee United States, with whom Joan M. Pepin, Susan M. Akers, Scott D. Bauer, attorneys, U.S. Department of Justice, and Lois J. Schiffer, Assistant Attorney General, were on the brief.

R. Bradford Fawley for appellee United Technologies Corporation, with whom Bruce C. Palmer, Robert A. Miller, and Downs Rachlin & Martin were on the brief; Alok Ahuja for appellees BFI Waste Systems of North America, Inc., Michael A. Macera, Robert A. Cece, and Macera Brothers Container Service, Inc., with whom Harold I. Kessler, Friedman & Kessler, William G. Beck, and Lathrop & Gage, L.C., were on the brief; Craig M. Scott for appellee City of New Jersey, with whom Duffy & Sweeney, LTD was on the brief; Mark T. Reynolds for appellee Electroformers, Inc., with whom Boyer, Reynolds & Demarco, LTD was on the brief.

———————————

August 17, 2001

———————————

* Of the District of Massachusetts, sitting by designation.

## Table of Contents

I        Background
II       The Consent Decrees
         A.      Background
                 1.   Consent Decree I
                 2.   Consent Decrees II, III, IV, and Capuano
                 3.   The District Court Approval
         B.      Reviewing the Approval of the Consent Decree
                 1.   Standard of Review
                 2.   Case or Controversy
                 3.   Fairness
                      a.   Procedural
                      b.   Substantive
                 4.   Reasonableness
                 5.   Statutory Fidelity
                 6.   Unconstitutional Taking
III      The Declaratory Judgment
         A.      Background on CERCLA Contribution Actions
         B.      The District Court's Declaratory Judgment Ruling
         C.      The Parties' Challenges to the Declaratory Judgment
                 1.   Proof that the Defendants Disposed of Hazardous
                      Waste
                      a.   Ashland
                      b.   Acco-Bristol
                      c.   Black & Decker a/k/a Gar
                      d.   Perkin-Elmer
                 2.   Wilbert Jones's Testimony
                      a.   Grounds for Exclusion
                      b.   Grounds for Disbelieving

3.    Exclusion of Master Chart
      a.   Procedural Posture
      b.   Admissibility of the Chart
4.    Proof that Defendants' Waste Caused or Contributed to Cleanup Costs
5.    The Entry of a Declaratory Judgment under 42 U.S.C. § 9613 (g)(2) and the Declaratory Judgment Act
6.    Morton's Liability
      a.   Claims of Clearly Erroneous Factual Findings
      b.   Claims of Legal Error
7.    Successor-in-Interest Liability for Gar
8.    UTC's Appeal
      a.   The Judgment in Favor of Macera
         i.   Transporter Liability
         ii.  Arranger Liability
      b.   The Judgment in Favor of the City of New Jersey

      c.   The Government's $6 Million Enforcement Costs
IV        Conclusion


Appendix I      A Roster of Parties, Principals, and Witnesses
Appendix II     A Summary of Relevant Monetary Sums

**LIPEZ, <u>Circuit Judge</u>.** This appeal concerns the third phase of litigation under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq., stemming from the disposal of hundreds of thousands of gallons of hazardous waste in the late 1970s at a site in Smithfield, Rhode Island owned by William and Eleanor Davis. This phase concerns an action by United Technologies Corporation (UTC) under CERCLA's contribution provision, 42 U.S.C. § 9613(f). In 1995, UTC was found jointly and severally liable for costs incurred by the United States for the cleanup of the Davis site. Hoping to relieve itself of some of the

burden of that judgment, UTC sued several dozen other potentially responsible parties.  Most of these parties, as well as UTC, signed partial consent decrees with the United States in which they agreed to pay a share of the cleanup costs.  Several parties, however, did not settle, and in 1998 UTC took them to trial.  One of the non-settlors, Ashland, Inc., appeals the district court's entry of the partial consent decrees.  Ashland and four other non-settlors also appeal the court's entry following trial of a declaratory judgment holding them liable for disposing of hazardous waste at the Davis site and allocating to them shares of responsibility for cleanup costs.  Finally, UTC appeals three aspects of the court's ruling.

We affirm, with one exception -- a remand for clarification of the district court's ruling that UTC may be solely responsible for $6 million in government enforcement costs.

## I. Background

We describe the facts in the light most favorable to the judgment.[1]  During the 1970s, William Davis operated a waste disposal site on ten acres of land in Smithfield, Rhode Island.[2]  In 1982, the

---

[1] To assist the reader of this opinion, there are two appendices attached.  The first identifies the roles of the multiple parties to this appeal and the roles of the key principals and witnesses.  The second breaks down the liability and settlement amounts referred to in the case.

[2] Forest borders the Davis site to the east and west, and wetlands and swamp border it to the north and south. When the United States filed suit in 1990, there were about 100 homes within one mile of the

Environmental Protection Agency (EPA) placed the Davis site on its National Priorities List of hazardous waste sites. After undertaking a remediation investigation and completing a feasibility study, the EPA issued a Record of Decision in 1987 describing the cleanup work that it deemed necessary to mitigate the environmental damage caused by the hazardous waste disposal.  As described by the EPA, the cleanup required the government to "(1) complete a water line to supply drinking water to areas where the drinking water wells already are contaminated and to areas where the contaminated groundwater plume threatens additional wells; (2) clean contaminated groundwater; and (3) excavate and clean contaminated soils that continue to contaminate the groundwater and other environmental media at the Site."  The EPA estimated the cost of this work at about $3 million for the water line, $13 million for groundwater cleanup, and $14 million for soil remediation.  The government began the work of constructing water lines to nearby residents, but took no action on the soil or groundwater cleanups.  See United States v. Davis, 11 F. Supp. 2d 183, 192 (D.R.I. 1998) (Davis II).

In 1990, the United States brought an action under 42 U.S.C. § 9607 for recovery of past and future response costs at the Davis site.  This provision of CERCLA allows the government to bring a "cost

_____

site, and about 3,800 residents within three miles. The site lies within a 20-mile radius of Providence, Rhode Island.

recovery action" against an owner or operator of a facility at which hazardous substances were disposed, against a transporter of hazardous waste, and against a party who arranged for the disposal or transport of hazardous waste. 42 U.S.C. § 9607(a).[3] The government sued William

_____

[3] Section 9607(a) states:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section--
> (1) the owner and operator of a vessel or a facility,
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for--
> (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;
> (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury,

-8-

Davis as an owner-operator; Eleanor Davis as an owner; United Sanitation, Inc. and A. Capuano Brothers Inc. as transporters and arrangers; and Ciba-Geigy Corporation, Clairol Inc., Pfizer Inc., The Providence Journal Company, and UTC as arrangers.[4]

The district court trifurcated the government's case. Phase I would determine whether the defendants were liable for response costs. Phase II would establish the amount of response costs incurred by the United States. Phase III, which is at issue in these appeals, would deal with all remaining claims, including claims for contribution, indemnification, and allocation of responsibility.

In 1991, with the government's case against it pending, UTC sued some of its co-defendants and 88 other companies under 42 U.S.C. § 9613(f), which allows one potentially responsible party (PRP) to bring an action for contribution against other PRPs.[5] Some of these

_____

destruction, or loss resulting from such a release; and
      (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

[4] The court at times referred to the arranger defendants as "generators." United States v. Davis, 882 F. Supp. 1217, 1219 (D.R.I. 1995) (Davis I).

[5] In its original form, CERCLA did not expressly provide that a party who was liable for cleanup costs under § 9607 could seek contribution from other PRPs. See Keytronic Corp. v. United States, 511 U.S. 809, 816 (1994). In 1986, Congress expressly created a "contribution action" by amending CERCLA with the Superfund Amendments and Reauthorization Act (SARA). 42 U.S.C. § 9613(f). Section 9613(f)

third-party defendants impleaded additional fourth-party defendants, bringing a total of 138 defendants into the litigation. The United States did not sue these parties directly.

In a 1994 partial consent decree, Clairol Inc., Ciba-Geigy Corporation, Pfizer Inc., and The Providence Journal Company agreed collectively to pay the United States $5.625 million, plus interest accruing from the date of the settlement, toward the Davis site cleanup. UTC, however, did not settle, and the government took it to trial in 1995.[6] After a bench trial, the district court found that UTC had dumped wax and solvent waste at the Davis site and held UTC jointly and severally liable for all past and future cleanup costs. See Davis I, 882 F. Supp. at 1225.

While preserving the right to appeal that judgment, UTC

_____

states in relevant part:

> (1) Contribution
> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

[6] The claims against William and Eleanor Davis, United Sanitation, and A. Capuano Brothers were not settled "but for reasons that are not entirely clear . . . were held in abeyance." Davis II, 11 F. Supp. 2d at 186.

stipulated that the response costs incurred by the EPA before September 30, 1987, and the enforcement costs incurred by the Department of Justice before September 30, 1994 -- the cut-off dates set by the court for determining the government's costs --  totaled $9.1 million.  See id.  UTC and the United States also stipulated that the $5.8 million ($5.625 million plus interest) paid by the four settlors would be deducted from UTC's liability.  These stipulations eliminated the need for a Phase II trial.

The case next proceeded to the Phase III claims for contribution, indemnification, and allocation of responsibility against the third and fourth-party defendants.[7] By April 1996, the government said that it had incurred $19 million in response costs for site study and partial construction of waterlines and $6 million in litigation enforcement costs.  See id. at 192.  It projected future costs of $3 million to complete the water lines, $14 million for soil remediation, and $13 million for groundwater remediation, bringing the total response and enforcement costs at the site to $55 million.  See id.

In settlement negotiations, the government assigned PRPs to two groups according to their estimated share of liability, with settlement amounts based on the strength of the evidentiary case against each party.  Eighty PRPs settled claims by joining one of five

_____

[7] In August 1997, Judge Pettine took inactive senior status, and the case was transferred to Judge Torres, who then presided over Phase III of the litigation.

partial consent decrees, which also afforded the parties contribution protection against other PRPs. The first and largest of these consent decrees involved the United States, UTC, and 49 third and fourth-party defendants. See id. at 185. The parties agreed to pay $13.5 million plus $440,000 in oversight costs, of which UTC would pay $2.8 million. In addition, UTC agreed to perform the soil cleanup for the Davis site. While the cost of the soil work was estimated at $14 million, UTC agreed to accept the risk that the work might in fact cost more. UTC's liability is reduced, however, by the other partial consent decrees, which provide for payments to UTC of up to $5.364 million. The district court approved the consent decrees in 1998 and 1999, finding them fair, both procedurally and substantively, reasonable, and consistent with CERCLA's objectives.[8] Soil remediation efforts began in July 1997. United States v. Davis, 31 F. Supp. 2d 45, 52 (D.R.I. 1998) (Davis IV). To avoid recontamination, the groundwater cleanup will begin after the soil work is completed.

Several defendants chose not to participate in any of the consent decrees. UTC prepared to try its claims for contribution against the non-settling defendants, including William Davis as owner and operator of the Davis site; Eleanor Davis as owner;

---

[8] The consent decrees are described in greater detail in Part II of this opinion.

Chemical Waste Removal (CWR),[9] Chemical Control Corporation (CCC),[10] and Macera Brothers Container Service, Inc. (Macera) as transporters;[11] and Acco Bristol Division of Babcock Industries (Acco), Ashland Chemical, Inc. (Ashland), Gar Electroforming Division (Gar), a/k/a Black & Decker,[12] Perkin-Elmer Corporation (PE), Thiokol, a/k/a/ Morton International Inc. (Morton), and the City of New Jersey as arrangers.[13] Before trial began, the district court said that the trial would adjudicate UTC's "request to determine the 'equitable contribution share of liability' for past and future response costs at the Site." However, when UTC admitted at the start of trial that it had not begun to incur costs for soil remediation by the close of discovery, the

---

[9]UTC also brought claims against CWR's principal, Emanuel Musillo, and against CWR's corporate predecessor and its principal, Drum Automation and Michael Musillo.  The district court found Emanuel Musillo liable with CWR.  The court dismissed the claims against Drum Automation and Michael Musillo.  UTC did not appeal these rulings.

[10] UTC also brought claims against CCC's principal, William Carracino.  The district court found Carracino liable with CCC.

[11]UTC also brought claims against BFI Waste Systems of North America as Macera's corporate successor.

[12] UTC brought claims against Black & Decker and Electroformers as Gar's possible corporate successors.  The district court found Black & Decker liable as Gar's successor and dismissed the claims against Electroformers.  Black & Decker appeals that ruling, as we discuss infra.

[13] UTC brought claims against several other defendants which the district court dismissed.  UTC did not appeal these rulings.

court narrowed the trial's focus to UTC's right to contribution for future rather than past costs. It defined future costs as those that UTC had incurred since the close of discovery and those that it would incur as it completed the soil remediation.

On September 28, 1998, following a 26-day bench trial, the court partially granted a motion for judgment made by some of the defendants based on partial findings pursuant to Federal Rule of Civil Procedure 52(c). The court ruled that while Macera had transported hazardous waste to the Davis site, it was not liable as a matter of law because UTC failed to prove that Macera "selected" Davis as a disposal site, as § 9607(a)(4) requires to hold a transporter of hazardous waste liable. See United States v. Davis, 20 F. Supp. 2d 326, 334 (Davis III). The court also dismissed UTC's case against the City of New Jersey, finding that the city was immune from liability under 42 U.S.C. § 9607(d)(2). Id. at 335.

On December 15, 1998, the court issued a declaratory judgment holding appellants Ashland, Acco, Gar, Morton, and PE liable for arranging for the disposal of their waste at the Davis site.[14] With the exception of Morton, the court allocated to each defendant a share of responsibility for UTC's future cleanup costs. Davis IV, 31 F. Supp.

_____

[14] The court also found William Davis liable as an owner-operator, Eleanor Davis liable as an owner, and CWR, CCC, and Capuano liable as transporters. Those parties have not appealed the judgments against them.

- 14 -

2d at 69.

The appeals currently before us result from the district court's entry of the Phase III consent decrees, its rulings for some of the defendants pursuant to Rule 52(c), and its declaratory judgment in favor of UTC. Ashland appeals the district court's approval of the consent decrees. Ashland, Acco, Gar, Morton, and PE appeal several aspects of the declaratory judgment. Specifically, four appellants (Ashland, Acco, Gar, and PE) argue that UTC failed to prove by a preponderance of the evidence that they arranged for the disposal of waste at the Davis site. These four appellants also argue that the district court abused its discretion by admitting and crediting the testimony of CWR driver Wilbert Jones. Acco and Gar also argue that the district court abused its discretion by excluding a "Master Chart" of the parties' claims compiled by UTC's lawyers to prepare the witness designated by UTC to testify on behalf of the corporation pursuant to Federal Rule of Evidence 30(b)(6). Three appellants (Ashland, Acco, and Gar) contend that UTC failed to prove by a preponderance of the evidence that their respective waste contained hazardous substances and so caused the incurrence of cleanup costs. These three appellants also argue that the court's entry of a declaratory judgment was improper. Appellant Gar, a/k/a Black & Decker, challenges the court's finding of corporate successor liability. Finally, UTC contests the court's dismissal of the case against the City of New Jersey and Macera, and

- 15 -

its ruling that UTC was solely responsible for $6 million in government enforcement costs incurred during Phase I and II of the litigation. We will discuss each of these challenges in turn.

## II. The Consent Decrees

### A. Background

#### 1. Consent Decree I

Ashland's appeal focuses on Consent Decree I, the primary settlement between the United States and UTC, which began consent decree negotiations with the United States as an alternative to pursuing an appeal of the judgment in Davis I. In discussions with UTC, the EPA assigned possibly settling PRPs (generators and transporters of waste) to two groups, "carve-out" and "non-carve-out." The carve-out entities were deemed primarily responsible for the waste at the Davis site, and so were compelled to negotiate individual settlements with the United States. Non-carve-out third parties were encouraged to negotiate a possible global settlement among themselves, with the assistance of liaison counsel.

On July 14, 1995, following the Phase I settlement with four parties, the United States offered to settle with all remaining parties for about $16 million plus the performance of site soil cleanup using low-temperature thermal desorption technology. UTC provisionally agreed to the United States's settlement offer and pursued its contribution claims. Ultimately, UTC, carve-outs Olin Hunt and

American Cyanamid, and about fifty other parties joined this settlement.  The parties paid a total of $13.5 million to the United States, plus $440,000 in oversight costs.  Of that amount, Olin Hunt and American Cyanamid paid $2.75 million each (with some portion going to resolution of state claims), non-carve-out parties paid a total of $7.2 million, and UTC paid the remaining balance, about $2.8 million.[15]

Furthermore, UTC took responsibility for the entire expense of site soil remediation, an estimated cost of about $14 million. Under the settlement, UTC and the United States each receive half of future contribution recoveries, with UTC's recovery capped at $5.364 million after deducting 15 percent of contribution recoveries for attorneys' fees incurred in contribution litigation after March 1996. Finally, the settling parties received complete contribution protection from claims by other PRPs.  Separate recoveries by the United States would not be subject to contribution sharing.

While the predicted cost of cleaning up the Davis site has varied over the years, the most recent estimate, from 1997, took into account new remediation technology and set the total at $55 million. This amount guided the United States in determining the settlement amounts.  In addition, the allocations to Clairol and the other parties

_____

[15] The allocation among the non-carve-outs was initially confidential, though the payment amounts have now been disclosed.

in the earlier Phase I, $5.625 million settlement provided a "benchmark" for the amounts requested from potential settlors in the later consent decrees.  Davis II, 11 F. Supp. 2d at 191.

### 2. Consent Decrees II, III, IV and Capuano

The remaining consent decrees included 27 additional parties and involved UTC's settlement of claims for contribution from other PRPs, resulting in some additional payments to the United States pursuant to UTC's agreement with the United States in Consent Decree I. In Consent Decree II, 23 parties paid a total of $4.135 million, with individual party liability detailed in briefs to the district court. Consent Decree III involved National Starch, which paid $5 million. Consent Decree IV involved a $150,000 payment by Swan Engraving and a $50,000 payment by Power Semiconductors.  All parties to these settlements received complete contribution protection from future claims.  Finally, Capuano Brothers paid $200,000 to the government, plus a like amount for settlement of cleanup costs at another Superfund site.

### 3. The District Court Approval

To assist in its assessment of Consent Decree I, the district court held a two-day hearing to determine whether the proposed settlement was fair, both procedurally and substantively, reasonable, and consistent with CERCLA's objectives. United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990).  Procedurally, the court

found that "[t]he negotiations were conducted openly and all parties were given an opportunity to participate." Davis II, 11 F. Supp. 2d at 189. Substantively, the court concluded that the consent decree met all requirements because the "proposed settlement reflects a rational method of allocating liability in a manner that reasonably approximates each party's share of responsibility; the method is applied evenhandedly with respect to all PRP's and sufficient information is presented to enable the Court to determine whether that has been done." Id. at 192.

In assessing the reasonableness of the consent decree, the court's chief concern was "whether the public can be adequately compensated by a settlement in which the United States receives only a portion of the remediation cost from a party previously adjudged liable for the entire cost," id. at 186, a reference to the release of UTC from the Phase I judgment. According to the district court, under the terms of the settlement the United States would receive $27.5 million, plus the $5.8 million from the original defendants, leaving a $21.7 million shortfall in compensation for the projected cost of the cleanup. This issue distinguished the Davis case from others in which the United States settled before judgment. "In those cases, compromising for a fraction of the response costs with a PRP that is potentially liable for the entire cost usually is justifiable on the ground that litigation might result in the United States recovering no

response costs at all." <u>Id.</u> at 192.

The court thus framed the reasonableness question in terms of "whether the amount by which the judgment has been discounted reasonably reflects the risk of reversal [on appeal]," and called this "a very close question." <u>Id.</u> at 193. The court acknowledged some "remaining, albeit diminished, litigation risk associated with the claim against UTC." <u>Id.</u> The court also suggested that concern about releasing UTC from the judgment was mitigated by the fact that the United States could still sue the non-settlors for the $21.7 million shortfall, but recognized that this course of action seemed to involve "much greater litigation risk" than simply pursuing the judgment against UTC. <u>Id.</u>

In resolving the issue, the court considered factors beyond an assessment of litigation risks. The court noted that "the financial obligations imposed on UTC are considerably greater than the obligations assumed by the other 'carve-out' settlors," reinforcing UTC's substantial responsibility. <u>Id.</u> It also noted that "given the deference accorded to the EPA's judgment in such matters, it cannot be said that the proposed discount is unreasonable." <u>Id.</u> The court said that the consent decree avoided an unduly harsh result for UTC, whereas the judgment would have "saddled [it], unfairly, with liability for remediation costs that far exceed its fair share." <u>Id.</u> Acknowledging that UTC could pursue contribution actions against other PRPs, the

court still concluded that the consent decree was reasonable given the great "difficulty of establishing entitlement to contribution." Id. Finally, the court found the consent decree to be consistent with the statute because it advanced "the overriding goal of promptly and efficiently cleaning up hazardous waste sites." Id.

Pursuant to its thorough opinion, the district court approved Consent Decree I on February 13, 1998, and entered final judgment on December 9, 1999. Consent Decrees II, III, IV and the Capuano decree were each summarily approved subsequently. Final judgment was also entered on these decrees in December 1999. On appeal, Ashland, a non-settling PRP, lodges numerous objections to the approval of the consent decrees, including a jurisdictional objection. We assess these arguments.

## B. Reviewing the Approval of the Consent Decrees

### 1. Standard of Review

Considerable deference is involved in the review of CERCLA consent decrees. Indeed, appellate review is "encased in a double layer of swaddling." Cannons, 899 F.2d at 84. First, there is deference to the administrative agency's construction of the settlement. "That so many affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's length and advocate its embodiment in a judicial decree, itself deserves weight in the ensuing balance." Id. at 84. Second, the

appellate court can only review a district court's approval of a consent decree for abuse of discretion, characterized by "a serious error of law" or a "meaningful lapse of judgment." United States v. Charles George Trucking, 34 F.3d 1081, 1085 (1st Cir. 1994); United States v. DiBiase, 45 F.3d 541, 544 (1st Cir. 1995). "Because an appellate court ordinarily cannot rival a district court's mastery of a factually complex case -- a mastery often, as in this instance, acquired through painstaking involvement over many years -- the district court's views must also be accorded considerable respect." Charles George, 34 F.3d at 1085. This double deference "places a heavy burden on those who purpose to upset a trial judge's approval of a consent decree." Cannons, 899 F.2d at 84.

## 2. Case or Controversy

As a preliminary matter, Ashland contends that the district court had no jurisdiction under Article III to approve the consent decrees because, "with the exception of UTC, the U.S. never sued any of the third or fourth-party defendants settling in Consent Decrees I-IV. Moreover, approximately 34 entities who were signatories to Consent Decree I were never sued by any party to this action." In Ashland's view, this circumstance means that there was no "case or controversy" to be resolved by the district court. We conclude that, even if there were parties not sued by the United States involved in the consent decrees, their inclusion would be permissible because the Supreme Court

has allowed unpleaded claims to be part of consent decrees, and thus, there is no "case or controversy" concern.

In <u>Local 93, Int'l Ass'n of Firefighters</u> v. <u>City of Cleveland</u>, 478 U.S. 501, 525 (1986), the Supreme Court ruled that a consent decree must (1) spring from and serve to resolve a dispute within the court's subject matter jurisdiction; (2) come within the general scope of the case based on the pleadings; and (3) further the objectives of the law on which the claim is based. Although <u>Firefighters</u> involved a challenge to the scope of a consent decree rather than an Article III case or controversy argument, satisfying the criteria set forth in that case resolves any case or controversy claim. The district court found that the criteria were satisfied by Consent Decree I:

> The United States's claims against the settling third and fourth-party defendants spring from and fall well within the scope of the controversy described in the pleading; . . . Furthermore, the United States and all of the settling PRP's are parties to the action[16] and the consent decree resolves the dispute among them. Finally, . . . approval of the consent decree also furthers the objectives of CERCLA by facilitating the prompt and efficient remediation of a major hazardous waste site.

<u>Davis II</u>, 11 F.Supp. 2d at 188.

---

[16] We understand the court's reference to "parties to the action" to include those initially sued by the United States, defendants to the UTC contribution claims, as well as the numerous parties named in suits among the third and fourth-party defendants.

We have applied the Firefighters test in the CERCLA context before.  In Charles George, we found that claims not expressly set out in the pleadings may be addressed in a consent decree as long as they fall within the pleadings' general scope.  34 F.3d at 1089-91. Likewise, unpleaded claims that could not be brought against third-party defendants pursuant to a case management order (CMO) were appropriately included in the consent decree.  Id. at 1091.  Here, the purported failure to file complaints contemporaneous with the consent decrees does not defeat the legitimacy of the settlements.  As we wrote in Charles George:

> [T]he Supreme Court has made clear that there is no per se prohibition against consent decrees that exceed the possible bounds of a decision issued directly by the trial court.  Because a consent decree is animated not only by the parties' legal claims but also by the parties' consent, a court is 'not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after trial.'

Id. at 1091 (quoting Firefighters, 478 U.S. at 525).

The district court allowed the inclusion of parties not sued by the United States in the consent decrees, finding that UTC's contribution claims "are based on the same body of evidence and raise the same issues as the United States' claims against the settling third and fourth-party defendants." Davis II, 11 F. Supp. 2d at 188.  Like a settlement that is greater in scope than the originally pled claims, the inclusion of various third and fourth-party defendants, as well as

interested non-parties, is permissible pursuant to <u>Firefighters</u>.[17]

Indeed, any conclusion to the contrary would disrupt the goals of

CERCLA, which seeks early settlement with as many PRPs as possible to

further expeditious remediation.

### 3. Fairness

#### a. Procedural

Assessing fairness in the CERCLA settlement context has both

procedural and substantive dimensions.  "To measure procedural

fairness, a court should ordinarily look to the negotiation process and

attempt to gauge its candor, openness, and bargaining balance."

<u>Cannons</u>, 899 F.2d at 86.  The EPA has ample authority to structure its

settlement negotiations, including "broad discretion to structure

classes of PRPs."  <u>Id.</u>  A finding of procedural fairness may also be an

acceptable proxy for substantive fairness, when other circumstantial

indicia of fairness are present.  See <u>Charles George</u>, 34 F.3d at 1089.

Ashland asserts that the consent decrees failed to meet the

criteria of procedural fairness because the establishment of party

categories inhibited the openness of negotiations; discovery relating

to the settlement terms was inadequate; and the United States abdicated

to UTC its responsibility to conduct the negotiations under CERCLA.

---

[17] Ashland further contests the inclusion of "successors in interest" and "corporate affiliates" within the scope of Consent Decree I.  Given the potential liability of such entities, this inclusion is appropriate.

- 25 -

Ashland also argues that information fundamental to evaluation of the consent decrees was not disclosed by the United States, including: (1) the United States' total past and estimated future costs of remediation; (2) the strength of the United States' case against each settlor; (3) the type, volume and toxicity of the waste for which each settlor was responsible and a correlation to site cleanup costs; (4) the formula by which the settlement amounts were calculated, and evidentiary support for the formula.

These arguments are unpersuasive. All identified players in the hazardous waste site were notified of early opportunities for settlement with the United States, and later, with UTC. There is no reason to doubt that the consent decrees were the result of "arm's length, good faith bargaining" between sophisticated parties. United States v. Comunidades Unidas Contra la Contaminacion, 204 F.3d 275, 281 (1st Cir. 2000). PRPs were offered the assistance of a magistrate judge and an alternative dispute resolution administrator in the negotiation of their settlements. In addition, the early classification of carve-outs and non-carve-outs was an attempt at settlement management within the discretion of the United States.

The district court also found no breach of the requirement for public disclosure, concluding that the parties offered "facts sufficient to enable one to determine whether" the terms of the agreement were fair. Davis II, 11 F. Supp. 2d at 194. The proposed

decrees lodged with the court "set[] forth, at length, all of the terms of the settlement." Id. They were published in compliance with 42 U.S.C. § 9622(d)(2)(A)-(B), making the decrees available to non-parties and the public for comment in a timely manner. Furthermore, the district court noted that "there is no indication that the United States misrepresented or withheld any material facts." Id. at 189. There is no error in any of these findings. Ashland's argument that the identified information had to be available is not supported by the law, which makes significant allowances for gaps in information, given the sometimes impossible task of deriving this data.

### b. Substantive

Substantive fairness involves concepts of corrective justice and accountability, concentrating on "the proposed allocation of responsibility as between settling and non-settling PRPs." Charles George, 34 F.3d at 1088. "[T]he proper way to gauge the adequacy of settlement amounts to be paid by settling PRPs is to compare the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them." Id. at 1087. Ashland asserts that the formula used by the government to assess liability among the carve-out and non-carve-out parties, settling or not, was arbitrary and capricious, unrelated to comparative fault and inconsistently applied across consent decrees.

The law on this issue is clear. The EPA formula should be

upheld "so long as the agency supplies some plausible explanation for it, welding some reasonable linkage between factors it includes in its formula or scheme and the proportionate shares of the settling PRPs." Cannons, 899 F.2d at 87. In assessing the formula applied, the quality of the information available to the government and settling parties informs the fairness analysis because data on the total extent of harm and the respective liabilities of various PRPs are often unavailable. See id. at 88. Such difficulties will not preclude a court from entering a consent decree. See Charles George, 34 F.3d at 1089. The calculation of liability and the allocation of that responsibility is specially within the scope of the Agency's and parties' expertise. "As long as the data the EPA uses to apportion liability for purposes of a consent decree falls along the broad spectrum of plausible approximations, judicial intrusion is unwarranted . . . . Having selected a reasonable method of weighing comparative fault, the agency need not show that it is the best, or even the fairest, of all conceivable methods." Cannons, 899 F.2d at 88.

In this case, the EPA assessed liability based on "its estimate of the volume of waste attributable to each PRP." Davis II, 11 F. Supp. at 190. The EPA also considered the strength of the cases against the respective PRPs, taking "into account that there was direct and credible evidence linking some of the PRP's to the Site and that the evidence with respect to other PRP's was almost entirely

circumstantial and varied in probative value." <u>Id.</u> The district court found the interplay of these factors in this case to be "rational" and "especially appropriate in cases like this where the wastes have been intermingled and it is virtually impossible to attribute discrete portions of the cleanup costs to particular wastes." <u>Id.</u> The court further observed that, in accord with the precedent, "assessing relative responsibility is an imperfect process because it requires subjective judgments based on evidence that is not completely developed and may be disputed. However, . . . the evidence need not be exhaustive or conclusive in order to determine whether a proposed settlement is substantively fair." <u>Id.</u> at 191.

We agree with the district court's analysis supporting the substantive fairness of the liability allocation among carve-outs and non-carve-outs, settlors and non-settlors alike. In arguments before the district court, the government attorney and others noted that the settlements involved "roughly half of the parties paying somewhat more than half of the costs." In its decision, the district court stressed the parity of the amounts paid by settling PRPs and non-settling PRPs, both carve-outs and non-carve-outs. <u>Davis II</u>, 11 F. Supp. 2d at 191. The court wrote:

> Comparing the amounts paid by the settling
> 'carve-out' PRP's to the Clairol benchmark and
> to the demands made upon the non-settling 'carve-
> out' PRP's supports the conclusion that the
> proposed settlement apportions liability in a
> manner that roughly approximates a rational

estimate of the relative responsibilities borne
by both the settling and non-settling PRP's.

Id. at 190.

The court proceeded to compare the settlement offered to American Cyanamid and Olin Hunt with the settlements paid in the Clairol agreement and demands made of eight non-settling carve-out PRPs, all of which fell between $2.75 million and $3 million. See id. at 191. Interestingly, the court also noted that the government demanded $8.25 million from the State of New Jersey, BFI and Ashland, averaging to a total of $2.75 million each, though Ashland "was expected to pay a larger share because EPA determined that Ashland produced a high volume of hazardous waste and that a significant amount of evidence existed linking Ashland to the Davis site." Id. at 191 n.7. Finally, the court noted "an even closer correlation between the amounts paid by settling 'non-carve-out' PRP's and the amounts demanded from non-settling 'non-carve-out' PRP's" -- $13.5 million demanded of eighty-five non-carve-out PRPs, averaging $158,800 apiece, compared with the $7.2 million proposed settlement with forty-seven non-carve-out PRPs, amounting to $152,200 each. Id. at 191. The court also pointed out that the allocation assessed to UTC was a considerably greater financial obligation than that imposed on any non-settling carve-out party. See id.

In addition, the ultimate measure of accountability "is the extent of the overall recovery, not the amount of money paid by any

- 30 -

individual defendant." <u>Charles George</u>, 34 F.3d at 1086.  Accordingly,

a consent decree need not specify each generator's or transporter's

degree of culpability.  It is appropriate for classes of PRPs to be

assigned aggregate settlement amounts to allocate among themselves.

See <u>id.</u>  In <u>Charles George</u> we said: "Realistically, a government

agency, in the midst of negotiations, is in no position to put so fine

a point on accountability.  We, therefore, endorse, in general, EPA's

practice of negotiating with a representative group of PRPs and then

permitting the group members to divide the burden of the settlement

among themselves."  <u>Id.</u>

Ashland's challenge to the group allocations in these

settlements is meritless.  Our prior observation remains pertinent:

"[A]s is true of consent decrees generally, they are built upon

compromise and compromise in turn is a product of judgment."

<u>Comunidades Unidas</u>, 204 F.3d at 282.  We agree with the district

court's conclusion that a "rational" method of allocating liability was

"evenhandedly" applied.  <u>Davis II</u>, 11 F. Supp. 2d at 192.

### 4. Reasonableness

In considering the reasonableness of Consent Decree I, the

district court addressed the novel issue of whether the public can be

adequately compensated by a settlement in which the United States

receives only a portion of the remediation cost from a party previously

adjudged liable for the entire cost.  See <u>Davis II</u>, 11 F. Supp. 2d at

186. Arguing that adequate compensation is not possible under such circumstances, Ashland asserts that the consent decrees do not comport with the objectives of CERCLA.

The assessment of reasonableness focuses on several elements: the effectiveness of the decree as a vehicle for cleaning the environment; providing satisfactory public compensation for actual (and anticipated) costs of remediation; and accounting for the relative strength of the parties' litigating positions and foreseeable risks of loss. See Cannons, 899 F.2d at 89-90. In making these assessments, a court must once again allow for the agency's lack of "mathematical precision," as long as the figures derive from a plausible interpretation of the record. Id. at 90. Furthermore, effective remediation demands a more pragmatic meaning than whether the settlement meets a scientific ideal or approximates the projected costs of cleanup. See Charles George, 34 F.3d at 1085; United States v. Charter Int'l Oil Co., 83 F.3d 510, 521 (1st Cir. 1996) ("A district court's reasonableness inquiry, like that of fairness, is a pragmatic one."); Comunidades Unidas, 204 F.3d at 281.

Although the UTC allocation in Consent Decree I does not pay for the entire expense of the cleanup, UTC assumed the full cost of soil remediation (mitigated by contribution from later settlors), even if that estimated cost ultimately exceeds projections. Furthermore, the consent decrees staved off litigation risks associated with the

settling parties, including a possible appeal by UTC of the judgment against it.  See Davis II, 11 F. Supp. 2d at 192.  In addition, as the district court observed, "fundamental fairness prohibits the imposition of liability that is totally disproportionate to UTC's share of responsibility."  Id. at 193.

Discounts on maximum potential liability as an incentive to settle are considered fair and reasonable under Congress's statutory scheme.  See DiBiase, 45 F.3d at 546; see also Interim CERCLA Settlement Policy, Environmental Protection Agency, 50 F.R. 5034 (February 5, 1985).  A PRP's assumption of open-ended risks, such as the full cost of a component of the cleanup, may merit a discount.  See Cannons, 899 F.2d at 88.  Also, party-specific discounts may reflect the chances of the United States's success in litigation against a given PRP.  See id.  It is appropriate "to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified."  Charles George, 34 F.3d at 1087.

The United States received a significant sum from the initial settlors, Consent Decree I settlors and contributions from settlors in Consent Decrees II-IV and Capuano.  Indeed, the United States fulfilled 60 percent of its $55 million claim through the consent decrees, including the earlier $5.625 million settlement with Clairol and other parties.  The United States also retains the option of pursuing future cost-recovery actions against other non-settling PRPs.  In light of the

role of the consent decrees in expediting the remediation work, the substantial cost recovery by the United States, and the strength of the cases against the various PRPs, we agree with the district court that the consent decrees met the test of reasonableness.

### 5. Statutory Fidelity

The purposes of CERCLA include expeditious remediation at waste sites, adequate compensation to the public fisc and the imposition of accountability. "[I]t would disserve a principal end of the statute -- achievement of prompt settlement and a concomitant head start on response activities -- to leave matters in limbo until more precise information [is] amassed." Cannons, 899 F.2d at 88; see also DiBiase, 45 F.3d at 545 ("[S]ettlements reduce excessive litigation expenses and transaction costs, thereby preserving scarce resources for CERCLA's real goal: the expeditious cleanup of hazardous waste sites."). Additionally, there is a "strong public policy in favor of settlements, particularly in very complex and technical regulatory contexts." Comunidades Unidas, 204 F.3d at 280. Importantly, even though it was not obligated to do so, UTC began the process of remedial soil treatment in July 1997, well before the approval of Consent Decree I. This task included: excavation, removal and proper disposal of more than 1,000 drums of waste and 10,000 small jars, containers and vials; removal of more than 750,000 tires; and sampling and chemical analysis of over 65,000 cubic yards of soil. This head-start on repair of a

hazardous waste site is the sort of good-faith cooperation that CERCLA seeks to encourage via settlement. To find this progress inadequate would frustrate the statute's purpose.

In asserting that the consent decrees are not faithful to the purposes of CERCLA, Ashland focuses on the contribution protection afforded the parties to the consent decrees, fearing that a handful of non-settlors (i.e., Ashland and the other appellants), foreclosed from contribution actions because they did not join the consent decrees, could be held liable for a disproportionate share of the $21.7 million in as-yet unrecovered costs if the United States pursued them in cost recovery actions. CERCLA provides that "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2); see also 42 U.S.C § 9622(f)(2). Despite this "matters addressed in the settlement" language of the statute, Ashland says that the "matters addressed" language of the decrees here is overreaching because they include, quoting the consent decrees, "response costs incurred and to be incurred by any person or entity other than the United States for response actions related to the site or identified in the remedy." Ashland complains that, "[a]s written, the 'matters addressed' provision of three partial consent decrees have been expanded to include all costs, whether the costs are incurred by the

U.S. or by a private party. This is clearly impermissible under CERCLA." Facing exposure to performance of the groundwater remedy, which may represent 40 percent of the total site costs, Ashland worries that parties like itself will bear disproportionate liability because they are unfairly barred from seeking contribution from earlier-settling parties.

The practice of encouraging early settlements by providing broad contribution protection is provided by statute. 42 U.S.C. § 9613(f)(2); see also Charter, 83 F.3d at 522; UTC v. Browning-Ferris Ind., Inc., 33 F.3d 96, 103 (1st Cir. 1994) ("This paradigm is not a scrivener's accident."). CERCLA also seeks to induce settlements at higher amounts by allowing settlors to seek contribution from those who have not yet settled. See 42 U.S.C. § 9613(f)(3)(B); Charter, 83 F.3d at 522. Still, EPA policy encourages the court reviewing a consent decree incorporating contribution protection to seek "a demonstration that this result is fair to potential contribution plaintiffs whose rights would be extinguished." DOJ/EPA Memorandum, Defining "Matters Addressed" in CERCLA Settlements, March 14, 1997. In a case such as this, where UTC assumes an open-ended cost for soil remediation, and takes the lead in coordinating settlements and beginning the cleanup effort, the benefit of contribution protection is appropriate. Also, as UTC points out in its brief, Ashland's preoccupation with the potential of disproportionate liability "ignores the fact that UTC,

which was allocated responsibility for 1.54 percent of the liability by the trial court, will perform the source control remedy, which will amount to over one-fourth of the total costs of remediating the site." UTC draws from this fact an appropriate conclusion: "This comparison shows that CERCLA can impose harsh results on PRPs; it also shows that these contribution defendants [Ashland and other non-settlors] may bear a burden roughly comparable to that of UTC."

The point we made in an earlier decision remains apt:  "As to the extinguished contribution claims of non-settlors or later round settlors, protection against those claims was a reasonable benefit [the settlor] acquired in exchange for settling before those others." Charter, 83 F.3d at 522.  The result of non-settlors possibly bearing disproportionate liability for the open-ended cost of remediation is therefore consistent with the statute's paradigm, which encourages the finality of early settlement.  See Browning-Ferris, 33 F.3d at 103.

**6. Unconstitutional Taking**

To the extent that CERCLA authorizes the contribution protection to which Ashland objects, Ashland asserts that this protection could result in an unconstitutional taking of the protectable property interests of non-settling parties because they will be prohibited from seeking contribution from earlier-settling parties.  Indeed, Ashland points out, CERCLA recognizes that in a settlement "limiting any person's right to obtain contribution from any

party," the result could be "a taking without just compensation" under the Fifth Amendment.  42 U.S.C. § 9657.

Ashland's argument in support of this takings claim is so perfunctorily developed that we deem it unworthy of response.  <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  In support of its takings argument, set forth in two-and-a-half pages at the end of an 85-page brief, Ashland relies entirely on a brief description of the recent Supreme Court decision in <u>Eastern Enterprises</u> v. <u>Apfel</u>, 524 U.S. 498 (1998), a case in which a deeply divided Supreme Court struck down retroactive application of the Coal Industry Retiree Health Benefit Act of 1992.  The takings analysis put forth by the plurality opinion in that case did not command a majority of the court, a fact which, as the government notes in its brief, severely limits the precedential value of that takings analysis.  <u>See</u> <u>Hertz</u> v. <u>Woodman</u>, 218 U.S. 205, 213-14 (1910) ("[T]he principles of law involved not having been agreed upon by a majority of the court sitting prevents the case from becoming an authority for the determination of other cases, either in this or in inferior courts.")  As Justice Kennedy noted in his concurring opinion in <u>Eastern Enterprises</u>, where he disavowed the takings analysis of the plurality: "Cases attempting to decide when a regulation becomes a taking are among the most litigated and perplexing in current law."

524 U.S. at 541. We will not assay the takings issue on the basis of the insubstantial argument put forth by Ashland.[18]

### III. The Declaratory Judgment

### A. Background on CERCLA Contribution Actions

When an innocent party, usually the government, brings a cost recovery action under § 9607, CERCLA imposes strict liability for the costs of cleanup on a party found to be an owner or operator, past operator, transporter, or arranger. See Acushnet Co. v. Mohasco Corp., 191 F.3d 69, 74 (1st Cir. 1999).[19] A party found liable under § 9607 may in turn bring an action for contribution against other polluters under § 9613(f). In other words, while CERCLA allows for full recovery of costs from a party sued successfully under § 9607, it also permits that party to seek contribution from other parties that have helped create a hazardous waste problem. See Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930, 936 (8th Cir. 1995). The statute thus provides that a court may, in its discretion, "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f). As the Ninth Circuit has said, "[a] PRP's contribution liability will correspond to that party's

---

[18] We note that the Sixth Circuit recently rejected a takings argument addressed to CERCLA and premised on Eastern Enterprises in Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc., 240 F.3d 534, 552 (6th Cir. 2001).

[19] A few affirmative defenses are available, but they are difficult to satisfy. See Acushnet, 191 F.3d at 74.

equitable share of the total liability and will not be joint and several." Pinal Creek Group v. Newmont Mining Corp., 188 F.3d 1298, 1301 (9th Cir. 1997).

The standard for contribution liability is the same as the standard for cost recovery liability. See Acushnet, 191 F.3d at 75. A plaintiff seeking contribution under § 9613(f) must prove that (1) the defendant falls within one of the four categories of covered entities (i.e. is a current or past owner or operator, a transporter, or an arranger); (2) a "release or threatened release" of hazardous waste involving the defendant's facility occurred; (3) the release or threatened release caused the incurrence of response costs by the plaintiff; and (4) the plaintiff's costs were "necessary costs of response . . . consistent with the national contingency plan." 42 U.S.C. § 9607.[20]

## B. The District Court's Declaratory Judgment Ruling

The district court found that UTC had unquestionably proven that the Davis site was a hazardous waste facility, that a release of hazardous waste had occurred, and that this release caused the incurrence of response costs because of the necessary cleanup. The

---

[20] The National Contingency Plan promulgated by the EPA, 40 C.F.R. pt. 300 (1988), "establish[es] procedures and standards for responding to releases of hazardous substances." Because the district court reserved challenges to UTC's specific expenditures for later proceedings, the compliance of UTC's cleanup plan with the National Contingency Plan is not at issue in this case.

court thus focused on the only remaining issue for CERCLA liability: "[W]hether the defendants are liable for those response costs on the grounds that they either operated the facility, transported the hazardous substances to the site, or arranged for the hazardous substances to be disposed of at the Site." Davis IV, 31 F. Supp. 2d at 61. Since each of the appellants was found to be an arranger, we focus on that aspect of the court's ruling.

The court began by considering the evidence that CWR, the Bridgeport, Connecticut waste transport company used by Ashland, Acco, Gar, and PE, disposed of waste at the Davis site. The court found that in 1977, "all of CWR's waste was taken, initially, to Sanitary Landfill," another Rhode Island disposal site, but that sometime after May 1977, Anthony and Jack Capuano, owners of Sanitary Landfill, began diverting some of CWR's waste to the Davis site. Id. at 53. Based on receipts kept by William Davis and offered into evidence by UTC, the court found that "the Capuanos directed CWR drivers to the Davis Site on fifteen separate occasions." Id. The Davis receipts show that these CWR deliveries took place between May 13 and July 7.[21]

The court said that CWR had two drivers, Wilbert Jones and Johnny Granfield, who collected 55-gallon drums of waste from

---

[21]Davis testified that dumping occurred on his property between 1976 and the first part of 1977. However, he was only able to locate receipts for the period between January 10, 1977 and July 7, 1977. As a result, that is the time period relevant to the district court's findings.

customers.  Both Jones and Granfield sometimes drove a 40-foot flatbed truck that carried a full load of 79 drums and was "used to haul drums to Rhode Island."  Id. at 52-53.  Based on the testimony of Jones and of Emanuel and Michael Musillo, the principals of CWR, the court made findings about CWR's pickup and disposal practices:

> If a full load was collected early in the day, the drums, sometimes, would be taken directly to Sanitary Landfill.  Usually, however, the truck would return to CWR, and the load of drums would be taken to Sanitary Landfill on the following day.  If less than a full load was collected, the drums would be kept at CWR until seventy-nine drums had accumulated.  Those drums then would be loaded onto the flatbed and driven to Sanitary Landfill.
>
> Drums were collected with such regularity that they never remained on CWR's premises for more than three days.

Id. at 53.

Following the theory that CWR disposed of waste within three days of collecting it from a customer, the district court matched the dates of CWR waste pickups from appellants Ashland, Acco, Gar, and PE to the dates of waste deliveries to the Davis site.  CWR kept bills of lading that recorded the dates on which it picked up wastes from customers.  Some of the appellants kept parallel invoices.  William Davis's receipts included the dates of waste deliveries.  Based on this evidence, the district court determined when an arranger's waste was picked up within three days of a delivery to the Davis site.  The court then concluded that it was "reasonable to infer" that this waste was in

fact disposed of at the Davis site. Id. at 56. For example, the court held Ashland liable for a 79-drum load that CWR picked up from Ashland on June 1, 1977 because a Davis receipt showed that CWR driver Wilbert Jones delivered 79 drums to Davis on June 2. Id.

The court next turned to allegations that transporter CCC, the company used by Morton, disposed of waste at the Davis site. The court found that CCC made 47 trips to the Davis site between May 1977 and the first week of July and that Morton's waste was included in some of those deliveries. Id. at 55.

Finally, the district court allocated responsibility for cleanup costs that UTC had incurred or would incur in completing the soil remediation. The chief factor in the court's determination was the volume of waste disposed at the Davis site that could be attributed to each defendant based on the evidence about specific deliveries. Davis IV, 31 F. Supp. 2d at 64. For example, the court found that CWR made two 79-drum deliveries containing 8,690 gallons of Ashland's waste to the Davis site, and so allocated to Ashland a share of responsibility for cleanup costs based on that volume. Id. at 67. Based on its calculations of waste volume, the court allocated 1.03 percent of UTC's future cleanup costs to Ashland, .16 percent to Acco, .03 percent to Gar, and .57 percent to PE. Id. at 69. The court also allocated 1.54 percent of responsibility to UTC. Id. Because the court found no evidence of specific deliveries yielding data about the

volume of Morton waste disposed, it did not allocate a share of future

cleanup costs to Morton.  Id. at 65.

**C. The Parties' Challenges to the Declaratory Judgment**

**1. Proof that the Defendants Disposed of Hazardous Waste**

We review the district court's factual findings pursuant to

a clear error standard.  See Dedham Water Co., Inc. v. Cumberland Farms

Dairy, Inc., 972 F.2d 453, 457 (1st Cir. 1992).  Clear error review

means that:

> Findings of fact will be given effect unless,
> after reading the record with care and making due
> allowance for the trier's superior ability to
> gauge credibility, the reviewing court form [sic]
> a strong, unyielding belief that a mistake has
> been made . . . . The same high level of respect
> attaches whether the conclusions of the trial
> court depend on its election among conflicting
> facts or its choice of which competing inferences
> to draw from undisputed basic facts.

Id. (internal quotation marks omitted).  Importantly for this case,

"[w]hen the evidence supports conflicting inferences, the district

court's choice from among the several inferences cannot be clearly

erroneous."  Id. at 462.  We also note that findings of fact, even if

brief, are sufficient as long as they permit a clear understanding of

the grounds for the decision below.  See Applewood Landscape & Nursery

Co., Inc. v. Hollingsworth, 884 F.2d 1502, 1503 (1st Cir. 1989). With

those standards in mind, we address each party's claims separately.

**a. Ashland**

In 1977, Ashland operated a chemical manufacturing plant in

Great Meadows, New Jersey, generating waste that contained nitrating acid, sulfuric acid, nitric acid, and solvents composed of isopropyl alcohol, methyl alcohol, toluene, benzene, and xylene. It is undisputed that Ashland contracted with CWR to dispose of this waste, and the record supports the district court's finding that CWR transported waste to the Davis site. While Michael Musillo of CWR testified that between 1975 and 1977 the company took all of its waste initially to the Sanitary Landfill owned by the Capuanos, Jack Capuano testified that after April 1977, when the landfill began getting complaints about odor, his brother Anthony Capuano began diverting some of CWR's waste to the Davis site.

CWR's pickup slips and billing records, as well as Ashland's disposal logs, show that during May and June of 1977, CWR picked up thirteen tanker loads and four flatbed loads from Ashland. Each of the flatbed loads contained 79 55-gallon drums. One of the flatbed pickups took place on June 1 and another occurred on June 30. Davis receipts bearing the name "Capuano," signed by Wilbert Jones, and recording 79-drum loads, show that CWR deliveries were diverted from Sanitary Landfill to the Davis site on June 2 and July 5. Based on its theory that CWR delivered its waste within three days of accumulating a full flatbed load, and the explanation that the intervening weekend and July 4th holiday accounted for the five-day gap between June 30 and July 5, the district court found Ashland liable for the waste that CWR

delivered to the Davis site on June 2 and July 5.

There is evidence in the record to support the court's conclusion. Emanuel Musillo, principal of CWR, testified that when a driver picked up a full 79-drum load early in the day, he would go straight to Rhode Island to dispose of it. When a driver picked up a full load late in the day or picked up only a partial load, he would park the load at CWR overnight. The next day the driver would either continue to Rhode Island if the truck was full, or collect waste from another customer if it was not. While Musillo did not definitively testify that CWR always delivered waste within three days of collecting it, he said that when a driver accumulated a full 79-drum load, the drums would be taken to Rhode Island "within a few days, I would imagine." CWR driver Wilbert Jones also testified that after picking up a complete load, he would leave it at CWR overnight and then leave for Rhode Island early the next morning.

Ashland challenges the court's factual findings on several grounds.[22] Ashland begins by pointing out that UTC presented no direct evidence, such as drums or other containers bearing Ashland's name and

_____

[22] Ashland titles the section of its brief challenging the district court's factual findings "As a Matter of Law, Ashland Could not Be Found Liable." This attempt to win de novo review fails. "[A]ppellant's plaint boils down to little more than thinly veiled dissatisfaction with the district court's factual findings." Dedham Water, 972 F.2d at 460. Ashland's alternate theories about why the court should have made other findings and inferences are factual rather than legal theories and so are subject to the clear error standard.

- 46 -

found at the Davis site, to show that Ashland's waste was on the CWR deliveries to the Davis site. While Ashland is correct, direct evidence is not a prerequisite to proving the elements of liability in a contribution action. See 42 U.S.C. § 9613(f) (setting forth elements of liability).

To attack the district court's finding that CWR disposed of waste within three days of collecting it, Ashland offers alternative scenarios. Ashland's most plausible theory is based on Jones's testimony that the Musillos sometimes "offloaded" nonflammable liquid waste by pouring it from drums into a tanker truck or underground storage facility at CWR.[23] Ashland argues that its waste thus was likely unloaded at CWR's Bridgeport site after pickup and either mixed with other waste or stored there for an indefinite period.

Additional testimony by Jones and the Musillos calls this theory into question. Jones was asked this question: "[L]et's suppose that you brought back some drums from one or more customers to Bridgeport, and that you offloaded those drums. Let's say it wasn't a full load. Typically, how long would it take before those offloaded

---

[23] Jones said in response to a question about whether CWR mixed waste collected at different times: "Things, anything that could be mixed and wouldn't explode, catch a fire, put it in the tanker. Then when the tanker is full take it to Rhode Island." Jones also said "if there was, let's say, an overflow of drums, there were more pickups to be made, and we couldn't handle it because the truck was full, and they had to be made, we would take them off, put them in the warehouse until we get a trip to go up to Rhode Island."

drums would find their way to Rhode Island to be dumped?" Jones answered: "No more than three days." Jones also said that the Musillos, not he, did most of the mixing work. Emanuel Musillo testified that offloading was not CWR's normal practice because of the "double work" involved. He said that when drums were offloaded, they usually contained waste oil that CWR could resell. Musillo also said that occasionally other kinds of waste were stored at CWR, but only until the next delivery trip to Rhode Island. Michael Musillo corroborated aspects of his brother's account.

In light of this testimony, the district court did not err in finding that it was more likely than not that the waste CWR collected from Ashland on June 1 and June 30 was the waste the transporter delivered to the Davis site on June 2 and July 5. Since both pickups from Ashland were full 79-drum loads, it seems particularly unlikely that CWR drivers would have taken a full load off the flatbed truck on one day, only to deliver a full load of different drums to the Davis site on the next business day. Ashland's alternative scenarios are simply "competing inferences" that the district court chose not to draw. Dedham Water, 972 F.2d at 457. Such a choice cannot be clear error.

Ashland's other alternative scenarios also run afoul of the clear error standard. First, Ashland argues that CWR often kept waste at its Bridgeport facility for unspecified periods, making it unlikely

- 48 -

that the transporter delivered Ashland's waste to the Davis site within three days of collecting it.  Ashland cites evidence that 13,000 drums of waste were stockpiled at CWR in the fall of 1977.  However, since Emanuel Musillo testified that stockpiling did not begin until CWR's disposal sites were shut down <u>after</u> the summer of 1977, the evidence on this point does not undermine the district court's findings.  Second, Ashland argues that the June 2 and July 5 disposals that CWR made at Davis likely contained waste generated by an unknown source that CWR picked up from an unidentified parking lot in the New Jersey Meadowlands.  While Jones testified that he picked up drum loads of waste from a parking lot somewhere in the Meadowlands not "more than eight or ten times" during 1977, he did not remember the dates of those pickups.  His testimony thus lacks the specifics necessary to link the Meadowlands pickups to the June 2 and July 5 deliveries to the Davis site.  Finally, Ashland argues that the June 2 and July 5 disposals contained waste that CWR picked up from CCC customers.  There is no evidence to show that CWR picked up waste for CCC during the relevant time period.[24]

---

[24] Ashland and PE also argue that the district court's finding that CWR had an established practice of delivering waste within three days of collecting it conflicts with <u>United States</u> v. <u>Newman</u>, 982 F.2d 665 (1st Cir. 1992).  However, <u>Newman</u> is inapposite to the case at hand.  In that case, we held that a trial judge did not abuse his discretion by excluding material habit evidence under Federal Rule of Evidence 406 when that evidence "did not <u>require</u> the conclusion that the putative practice was followed with the necessary regularity."  <u>Id.</u> at 669 (emphasis added).  <u>Newman</u> thus concerns the standards for the

In short, while the testimony by Jones and the Musillos contains some minor ambiguities, the district court did not err by inferring that CWR regularly disposed of waste within three days of collecting it, or by inferring that CWR transported Ashland's waste to the Davis site on June 2 and July 5.[25]

### b. Acco-Bristol

---

admission of habit or routine practice. Here, by contrast, the testimony from the Musillos and Jones was admitted without objection by the appellants, who now argue that this evidence is not sufficient to establish CWR's pickup and delivery practices. This argument fails. Once routine practice evidence has been admitted, Rule 406 does not limit the district court's consideration of such evidence, or the weight that it may be given.

[25] Ashland also mounts a misnomer defense, arguing that UTC did not name the proper party in its pleadings when it sued "Ashland Chemical Inc." rather than "Ashland Chemical Co." According to stipulations of fact by the parties, Ashland Chemical Inc. was incorporated in 1989 and merged into Ashland Oil Inc. in 1993. In 1996, Ashland Oil Inc. changed its name to Ashland Inc. Ashland Chemical Co., which operated the Great Meadows, New Jersey facility from which CWR transported hazardous waste, was a division of Ashland Oil Inc. in 1977. While Ashland Chemical Inc. may technically be an inaccurate reference to Ashland Chemical Co., there is no question that Ashland received adequate notice that it was being sued, and that it owned the Great Meadows facility from which the liability at issue here stemmed. Cf. Fed. R. Civ. Proc. 15(c)(3), Advisory Committee Notes 1991 Amendment ("An intended defendant who is notified of an action within the period allowed . . . for service of a summons and complaint may not under the revised rule defeat the action on account of a defect in the pleading with respect to the defendant's name . . . . [A] complaint may be amended at any time to correct a formal defect such as a misnomer or misidentification."); Hill v. Shelander, 924 F.2d 1370, 1374 n.2 (7th Cir. 1991) ("Plainly, the new language [of Rule 15(c)(3)] comprehends a situation where the original complaint sues the correct party but identifies him by a technically incorrect name."). There is no question here that UTC sued the correct party and that judgment was entered against that party. As a result, we reject Ashland's misnomer defense.

Acco-Bristol Division of Babcock Industries maintained a manufacturing facility in Waterbury, Connecticut in 1977. This facility produced controls for oil and gas lines through processes involving electroplating, soldering, welding, and degreasing machine parts. Wastes produced by Acco included 1,1,1-TCA, a soap and cyanide waste stream, and acid sludge. Acco typically put the waste in 55-gallon drums for disposal.

CWR twice picked up waste from Acco during the spring and summer of 1977, collecting 50 drums on April 6[26] and 24 drums on June 28. On June 29, CWR received a check in the amount of $324 for these pickups. A "Capuano Dumping Charge Slip," also dated June 29, indicates that CWR delivered a full load of 79 drums to the Davis site. The evidence at trial indicated that drivers directed to the Davis site by the Capuanos at Sanitary Landfill sometimes presented Capuano dumping receipts to William Davis. Davis testified that he used these slips to verify the amount of waste dumped on his property and to help him prepare invoices for Sanitary Landfill. In keeping with this practice, Davis sent a bill to Sanitary Landfill on June 29 for 79 gallons of waste.

Based on this evidence, the district court inferred that the 24 drums of Acco waste went to the Davis site in CWR's shipment on June

---

[26] The district court declined to infer that the shipment picked up by CWR on April 6 went to the Davis site because there were no Davis slips within three days of that date.

29.  We cannot conclude that this determination is clearly erroneous. Acco points out that on June 27 and 28, CWR picked up 99 drums of waste from various customers -- 20 drums more than were dumped at the Davis site.  However, at least 17 of those drums were picked up from customers who frequently disposed of waste oils.  Because CWR tended to sell waste oil to salvagers, as we have noted, the district court's conclusion that the 24 drums of Acco's waste were part of the 79 drums sent to the Davis site on June 29 was reasonable.

Acco argues that the district court erred in relying on the Capuano slip to infer the presence of Acco's waste at the Davis site because the slip does not specify a transporter.  Specifically, Acco claims that CCC or another waste company, rather than CWR, Acco's only transporter, could have brought the waste delivered on June 29.  However, testimony at trial makes clear that by June 1977, CCC was dumping waste directly at the Davis site without stopping at Sanitary Landfill first.  Thus, it is not likely that the June 29 Capuano Dumping Charge Slip accounted for waste hauled by CCC.  As a result, we cannot say that the district court's findings that the Capuano slip referred to waste dumped by CWR, and that Acco's waste was part of that delivery, was clearly erroneous.  See Dedham Water, 972 F.2d at 463.

### c. Black & Decker a/k/a Gar

Gar operated an electroplating business in Danbury, Connecticut.  Its waste contained nitric acid, copper, nickel, and

cyanide. According to CWR records, the transporter picked up five loads of waste from Gar on May 6 (13 drums), June 20 (5 drums), June 27 (2 drums), September 2 (7 drums), and September 30 (11 drums). A Davis receipt shows that on June 21, the day after the five-drum pickup, CWR disposed of 60 drums of waste at the Davis site. The five drums collected on June 20 contained 275 gallons of waste. Based on this evidence, the district court found Gar liable for dumping 275 gallons of waste at the Davis site.

Gar poses two challenges to the court's factual findings.[27] It notes that CWR picked up more than 300 drums[28] from Connecticut and New Jersey customers on the three business days before June 21, and concludes that in light of those pickups it is not mathematically likely that Gar's five drums were among the 60 drums that CWR delivered to Davis on June 21. Admittedly, the collection of more than 300 drums in the days leading up to the June 21 delivery to Davis means that it is less likely that Gar's five drums were among those delivered than it is, for example, that the 79 drums picked up from Ashland on June 1 were the 79 drums delivered to the Davis site on June 2.

---

[27] Gar also argues, like Ashland, that there was no direct evidence that its waste ended up at Davis, and that CWR regularly offloaded its customers' waste at its property for unspecified periods of time and also mixed different customers' waste at its Bridgeport facility. These arguments fail for the same reasons discussed above.

[28] Gar says that CWR picked up 352 drums on the three business days before the June 21 delivery. UTC counts 326 drums and 13 smaller containers collected between June 17 and June 22.

Nonetheless, the evidence that Gar emphasizes does not lead us to conclude that the district court's findings were clear error. As UTC points out, the Davis receipts show that CWR delivered a total of 219 drums to the Davis site on June 21, June 22, and June 23, increasing the likelihood that Gar's five drums were among those delivered. In addition, 62 of the 300-plus drums collected on the preceding days came from customers that sent waste oil to CWR, and so, according to Emanuel Musillo's testimony, would likely have been offloaded and stored for resale rather than being delivered to the Davis site.

To cast further doubt on the district court's findings, Gar points out that the Davis slip from June 21 says "SOLIDS" for solid waste, and that Gar produced liquid waste. Davis's testimony at trial undermines the significance of the solids designation. Davis said that he distinguished between solid and liquid waste because he poured liquid waste out of the barrels and resold them. Because he could not resell the barrels containing solids, he charged more for solid waste (one dollar per barrel) than he did for liquid waste (50 cents per barrel). Davis therefore had a financial incentive to classify drums of waste as solid rather than liquid. Davis also testified that he considered anything "solid" that did not pour easily, including any sludge or residue left in the drums. Also, there is no evidence that Davis examined each barrel before classifying a shipment.

Finally, Gar notes that while the evidence shows that CWR driver Johnny Granfield made the June 21 delivery to the Davis site, there is no evidence concerning which CWR driver picked up Gar's waste on June 20. This matters because each CWR driver only drove waste to the Davis site that he himself collected. Thus Gar argues that the possibility that Wilbert Jones, the other CWR driver, picked up its waste on June 20 lessens the likelihood that its waste was among the 60 drums delivered to the Davis site on June 21. However, since there is no evidence to show that Granfield was not the driver who collected Gar's waste on June 20, and since the evidence did establish that the driver who delivered waste to the Davis site had picked it up, the district court could have inferred that Granfield collected the waste from Gar, and that this waste was on his truck when he made the June 21 delivery to Davis.

### d. Perkin-Elmer

PE operated four Connecticut facilities in 1977, at which it generated waste that included methylene chloride, 1,1,1-TCA, and toluene.[29] PE acknowledges that these hazardous substances were identified at the Davis site.

---

[29] PE operated facilities at four locations: (1) a primary manufacturing facility in Norwalk; (2) a research facility at 50 Danbury Road in Wilton; (3) a manufacturing and research facility at 77 Danbury Road in Wilton; and (4) and Qualitron Corporation's manufacturing facility in Danbury. Qualitron became a wholly-owned subsidiary of PE in May 1984. PE does not contest its responsibility for Qualitron's environmental liability in this case.

PE's records show that CWR picked up waste from one of PE's facilities seven times during the spring and early summer of 1977: on May 26, June 20, June 22 (from three facilities), June 27, and July 1. Davis slips indicated that CWR delivered drums to the site on May 27, June 21, June 23, June 29, and July 5, 6, and 7. Based on the theory that CWR delivered waste within three days of collecting it, the district court inferred that the PE pickup on May 26 was dumped at the Davis site on May 27; the pickup on June 20 was dumped on June 21; the pickups on June 22 were dumped on June 23; the pickup on June 27 was dumped on June 29; and the pickup on July 1 was dumped on July 5, 6, or 7.

PE objects to the district court's finding of liability on numerous grounds. First, it argues that the court erred in not "locating and identifying" PE's waste at the Davis site. As PE notes, the district court said in articulating the proof required by CERCLA: "In the context of this case, proof that a defendant generator's hazardous waste 'can be located and identified at the Davis Site' is a sina qua non in establishing arranger liability." Davis IV, 31 F. Supp. 2d at 61 (quoting Davis I, 882 F. Supp. at 1221). PE argues unpersuasively that the district court intended with this language to create a new and higher standard of liability under CERCLA, requiring that UTC establish waste deposits with direct evidence such as containers bearing PE's name and containing residue of a hazardous

waste PE generated. We have already rejected an interpretation of CERCLA that "would cast the plaintiff in the impossible role of tracing chemical waste to particular sources in particular amounts, a task that is often technologically infeasible due to the fluctuating quantity and varied nature of the pollution at a site over the course of many years." Acushnet, 191 F.3d at 76.

PE also points out that the number of drums of waste picked up by CWR in any three-day period before PE's waste was allegedly delivered to the Davis site is not the same as the number of drums noted on the Davis slip for that day. However, as we have discussed above, some of those drums from other customers contained waste oil which CWR often salvaged and so likely would not have delivered to the Davis site. Thus, the discrepancy between the number of barrels picked up and delivered by CWR does not undermine the court's conclusion that PE's waste went to the Davis site.

PE also argues that its waste was not dumped at the Davis site because it produced only liquid waste, and all of the Davis slips linking its waste to the site indicated that the barrels dumped by CWR contained solid waste. PE's contention that it only produced liquid waste is contradicted by evidence in the record. Joseph Rabideau, designated by PE to testify on behalf of the corporation, testified that CWR disposed of waste for PE that included "a solidified scrape off type material" and that waste picked up by CWR in open-top five

gallon pails was "solidified material." Rabideau also explained that PE's use of methylene chloride as a solvent produced "still bottoms" that were disposed of "in a fairly solidified form." PE also produced a semi-solid paint residue sludge as part of its paint operation.

Moreover, as we have discussed, Davis's testimony at trial demonstrated that his classification of waste as solid or liquid was not an exact process. Thus, the district court did not clearly err in concluding that waste classified as a liquid by PE might nonetheless be considered a solid by Davis if the barrel contained any residue that could not be easily poured. Based on this evidence, it was not clear error for the district court to conclude that Davis could have characterized a shipment of 79 barrels as "solid" even though some -- or even most -- of the drums he did not examine actually contained liquids.

In sum, all of PE's objections to the district court's finding of liability are essentially disputes about the court's finding of the facts and the inferences drawn from CWR's established waste practices. We must uphold these findings and inferences unless they are clearly erroneous. See Dedham, 972 F.2d at 457. For the reasons we have explained, evidence in the record amply supports the district court's determinations.

### 2. Wilbert Jones's Testimony

Acco, Ashland, Gar, and Perkin-Elmer all argue that the

district court erred in admitting and crediting the deposition testimony of Wilbert Jones, one of the two drivers who hauled waste for CWR. At the time of his deposition in June 1996, Jones was unemployed and very ill. He died in May 1997. UTC paid Jones approximately $30 per hour as compensation for the time he spent preparing and testifying, for a total of between $700 and $800.[30]

At trial, the defendants argued that UTC's payments to Jones raise an inference that Jones's testimony was improperly influenced by UTC and should be excluded for that reason. The district court rejected this argument in a ruling from the bench, finding that "under these circumstances it's a reasonable amount to have paid him." The defendants appeal this ruling to admit the testimony.

Citing two grounds for disbelieving Jones's testimony, the defendants argue further that the district court should not have credited Jones's testimony. First, they state that the payments UTC made to Jones -- if they do not render his testimony inadmissible -- should have caused the district court to reject his account of CWR's practices. Second, the defendants argue that Jones should not be believed because he signed affidavits prepared for other litigation that they claim are inconsistent with his testimony in this case.

---

[30] The defendants claim that UTC did not timely or adequately disclose the details of the payments it made to Jones. However, the issue of his compensation was raised during the June 1996 deposition and the defendants had the opportunity to cross-examine Jones on the issue of compensation at that time.

## a. Grounds for Exclusion

We first consider whether the district court abused its discretion in admitting Jones's deposition testimony.[31] To the extent that the defendants argue that the payments to Jones rendered him incompetent as a witness, their effort fails. Federal Rule of Evidence 601 provides: "Every person is competent to be a witness except as otherwise provided in these rules."[32] See also United States v. Devin, 918 F.2d 280, 292 (1st Cir. 1990) ("It is a well-established principle, embodied in Fed. R. Evid. 601, that witnesses are presumed competent to testify."). A district court's determination to allow a witness to testify is overturned only for abuse of discretion. See Devin, 918 F.2d at 292; United States v. Hyson, 721 F.2d 856, 864 (1st Cir. 1983)

---

[31] The defendants cite Rule 3.4(b) of the Rhode Island Rules of Professional Conduct for the proposition that a lawyer shall not "offer an inducement to a witness that is prohibited by law." This ethical rule does not advance their argument. The rule only prohibits compensation given to a witness in violation of law. For reasons we explain here, reasonable compensation to witnesses is not prohibited by law and does not render their testimony inadmissible.

[32] As the district court recognized, the defendants' challenge to Jones's competency is not a challenge to his competency "in the sense of whether he had all of his [mental] faculties." While "competency" generally refers to a witness's mental capacity to perceive events and comprehend the obligation to tell the truth, see, e.g., United States v. Devin, 918 F.2d 280, 292 (1st Cir. 1990) (affirming district court's determination that a witness with a history of psychiatric episodes was competent), the concept of competency has been used to challenge testimony where it is alleged that a witness's credibility is so poor as to render his or her testimony inadmissible, see, e.g., United States v. Bedonie, 913 F.2d 782, 799 (10th Cir. 1990) (rejecting the argument that prior inconsistent statements rendered a witness incompetent to testify under Rule 601).

("The competency of a witness to testify is for the trial judge.").

We have been reluctant to exclude testimony based only on the fact that a witness was paid. For example, in United States v. Cresta, where an informant had been paid by the government, we said: "Rather than adopting an exclusionary rule for a particular factual situation, irrespective of the mode of payment, we prefer the rule that would leave the entire matter to the jury to consider in weighing the credibility of the witness-informant." 825 F.2d 538, 547 (1st Cir. 1987) (quoting United States v. Grimes, 438 F.2d 391, 396 (6th Cir. 1971)). See also Borges v. Our Lady of the Sea Corp., 935 F.2d 436, 440 (1st Cir. 1991) (assuming without deciding that even if a witness's statements were obtained improperly, "such impropriety in the means of obtaining a statement would not automatically bar admission of the statement at trial."). Since the witness in Cresta had received most of his compensation prior to trial, his payment was not contingent upon the conviction of any of the defendants. See id. Because the witness had been thoroughly cross-examined about the nature of his agreement with the government and the jury had been told to consider his testimony with care, the admission of the testimony was upheld on appeal. While Cresta involved a payment to a government informer rather than to a witness deposed in a civil action, the reasoning of Cresta applies here. The defendants have not claimed that the payment to Jones was contingent upon a finding that the defendants were liable.

Additionally, the district court was fully informed about the payments made to Jones -- as the jury was in <u>Cresta</u> -- and considered those payments as part of its assessment of Jones's credibility. The defendants have not attempted to distinguish <u>Cresta</u> from the instant matter.[33]

### b. Grounds for Disbelieving

The defendants argue that even if the payments Jones received did not render his testimony inadmissible, those payments should have caused the district court to discredit Jones's testimony. Specifically, they say that Jones's total compensation is excessive in light of the fact that he was elderly, ill, and unemployed at the time of the deposition. They claim that the time spent testifying did not divert Jones from any other lucrative pursuits and that payments at a rate of $30 per hour constituted a windfall to him and raise an inference that the payments were intended to improperly influence his testimony. The district court explicitly considered these arguments and rejected them. Reviewing the court's decision to credit Jones's

---

[33] The case cited by the defendants for the proposition that payment to a fact witness to testify at depositions violated a state ethics rule prohibiting lawyers from offering inducements to witnesses is <u>Golden Door Jewelry Creations, Inc.</u> v. <u>Lloyds Underwriters Non-Marine Assoc.</u>, 865 F. Supp. 1516, 1526 (S.D. Fla. 1994). <u>Golden Door</u> is easily distinguished from the present case because the payments to two witnesses totaled over $400,000 and $100,000. <u>See</u> <u>id.</u> Indeed, <u>Golden Door</u> itself acknowledges that "[p]ayments made to fact witnesses as actual expenses as permitted by law will not be disturbed or set aside." <u>Id.</u> at 1526 n.11.

testimony for clear error, see United States v. Rostoff, 164 F.3d 63, 71 (1st Cir. 1999), we find none.[34]  Although Jones was ill and unemployed when he gave his testimony, $30 per hour is not a payment so outrageously high as to raise an inference that his testimony was influenced.  As the district court stated from the bench when it ruled on this issue: "Everybody's time is worth something."

The defendants also argue that the district court should have discredited Jones's deposition testimony because he allegedly made prior inconsistent statements in affidavits he signed for litigation known as the Picillo Superfund case.  See generally O'Neil v. Picillo, 883 F.2d 176 (1st Cir. 1989).  Jones signed these Picillo affidavits in September 1995.  Four of the affidavits were admitted into evidence at the Davis trial.  The affidavits all said in similar language that Jones dumped waste at the site known as the "Picillo Pig Farm" in Coventry, Rhode Island during 1977.  For example, the affidavit relating to PE states the following:

> One of the Musillo customers I went to was Perkin
> Elmer in Norwalk, Connecticut.  Each week, during

---

[34] The defendants attempt to avoid this deferential standard of review by arguing that the district court was not in a position to evaluate Jones's credibility firsthand because Jones's testimony at trial was submitted by reading lengthy excerpts from his deposition.  However, it is well-settled that the court's credibility findings regarding deposition testimony are still entitled to deference on appeal.  See Amer. Foreign Ins. Ass'n v. Seatrain Lines of Puerto Rico, Inc., 689 F.2d 295, 298 (1st Cir. 1982) (applying clearly erroneous standard of review to factual findings of the trial court even where the record consisted only of photographs and deposition testimony).

> the year 1977, I would haul 15 to 20 drums, 55
> gallon size . . . . I would haul these same drums
> of waste to the Chemical Waste Removal yard in
> Bridgeport where they were stored until a full
> flatbed trailer load of 79 drums was accumulated.
> I would then dispose of these Perkin Elmer drums
> of waste at Picillo Pig Farm.

Attorneys for the defendants questioned Jones about these statements during his deposition and asked him to reconcile the affidavits with his testimony in the Davis litigation. He explained that he never dumped at the Davis site again after he began dumping at the Picillo site in 1977. Therefore, Jones's deposition testimony in this case and the Picillo affidavits may be interpreted to provide a consistent account of his dumping practices during 1977: Jones dumped at the Davis site until Davis stopped accepting waste in September, at which time he began dumping at the Picillo pig farm. Moreover, even without this explanation, the affidavits are not facially inconsistent with Jones's testimony because the affidavits do not mention the Davis site at all, leaving open the possibility that Jones dumped at both sites during 1977, but at different times. In sum, the statements in the Picillo affidavits are not, as the defendants contend, flatly contradictory or inconsistent with Jones's testimony in the Davis litigation. Particularly in light of the documentary evidence offered at trial -- consisting of Davis slips, bills of lading, and other ledgers and receipts -- and the testimony of the Musillo brothers that corroborated much of what Jones said, we cannot conclude that the district court

clearly erred in choosing to credit some of Jones's testimony.

### 3. Exclusion of Master Chart

Acco and Gar argue that the district court erred in excluding a 120-page chart captioned "Contentions of the Contribution Plaintiffs" that UTC's lawyers prepared for the Rule 30(b)(6)[35] testimony of UTC's corporate designee, Troy Charlton. The chart summarized information UTC obtained during discovery about the claims and theories of various parties to the litigation, most of whom were third or fourth-party defendants. More specifically, the chart, organized by party name, listed information about the dates of disposal at the Davis site, the volume of waste, the hauler used by that party, and the hazardous substances contained in the waste. The chart also identified pertinent documents and testimony for each of the parties. Charlton referred to the chart to answer questions throughout his deposition and occasionally read from it verbatim.

---

[35] Fed. R. Civ. P. 30(b)(6) provides:
A party may in the party's notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. A subpoena shall advise a non-party organization of its duty to make such a designation. The persons so designated shall testify as to matters known or reasonably available to the organization.

## a. Procedural Posture

UTC claims that Acco and Gar cannot appeal the exclusion of the chart from evidence because they did not move for its admission below.  Only Sealed Air Corporation (SAC) and Morton moved to introduce the chart at trial, arguing that it constituted an admission by UTC.  See Fed. R. Evid. 801(d)(2) (defining admissions by a party-opponent as "not hearsay").  Neither SAC nor Morton appealed the district court's denial of their motions, although Acco and Gar now argue that the district court erred in excluding the chart.  Acco and Gar are not precluded from making this claim despite their failure to do so below.  The plain language of Fed. R. Evid. 103(a)(2), written in the passive tense, does not require a party to have made an offer of proof at trial in order to preserve the right to appeal.  Rather, Rule 103(a)(2) states that an offer of proof is adequate when: "In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."  Fed. R. Evid. R. 103(a)(2) (emphasis added).  In considering whether an adequate offer of proof was made at trial, we have focused on whether the proof sufficed to notify the court of the significance of the evidence such that the record was developed adequately for appeal.  See, e.g., Harrison v. Sears, Roebuck & Co., 981 F.2d 25, 30 (1st Cir. 1992) (Rule 103(a)(2) requires an offer of proof "to ensure that the trial judge and the appellate court can

evaluate the matter fully"). Morton and SAC made an adequate offer of proof in attempting to admit the master chart into evidence. They filed motions to admit the chart, as well as lengthy memoranda of law, and argued orally before the district court that it was admissible as an admission by UTC. Accordingly, Acco and Gar may appeal the district court's decision to exclude the chart.[36]

### b. Admissibility of the Chart

In moving to introduce the chart at trial, SAC and Morton argued that it constituted a party admission by UTC. See Fed. R. Evid. 801(d)(2). Ruling on this motion from the bench, the district court concluded that the chart was UTC's statement but found that it did not qualify as an admission. Noting that there must be "some indication of reliability" for the statement to be an admission, the court found that a party cannot be "bound by statements that simply relate to hearsay information received regarding matters clearly outside the scope of the corporations knowledge or statements that describe evidence compiled from third-party sources by the corporation in preparation for trial." The district court then explained its view of the statements contained in the master chart, noting first that it appeared "to contain a

_____

[36] UTC cites only one case to support its argument that Acco and Gar may not appeal the ruling to exclude the chart. See United States v. Long, 706 F.2d 1044, 1052 (9th Cir. 1983) (finding that defendant who did not move to admit an affidavit at trial had waived his right to do so on appeal, although his co-defendant had moved for its admission). In light of the plain language of Fed. R. Evid. 103 and our precedent on this issue, we do not find Long persuasive.

mixture of different things."  The court described the chart as follows:

> Information that UTC received from a variety of third-party sources.  For example, it consisted primarily of things like what UTC has summarized as being contained in documents obtained from Mr. Davis and others; what Mr. Carracino and others may have said according to UTC in their depositions.  They all - they also contain, in addition to this . . . information, which seems to be dominant, they also contain a significant - significant number of unattributed statements [or] inferences based on the first category of information.

Accordingly, the district court denied Morton and SAC's motions to admit the master chart, concluding: "it is impossible to determine exactly what all this information is and in a sense it clearly appears that most of it is simply information obtained from third-party sources and compiled in preparation for trial."

"[A] trial court enjoys considerable discretion in connection with the admission or exclusion of evidence." Udemba v. Nicoli, 237 F.3d 8, 15 (1st Cir. 2001).  The decision not to admit the chart in this case is reviewed for abuse of discretion. See Udemba, 237 F.3d at 15; Williams v. Drake, 146 F.3d 44, 47 (1st Cir. 1998).  With respect to party admissions, we have noted the following:

> For a statement to be an admission under Rule 801(d)(2), the statement must be made by a party, or by a party's agent or servant within the scope of the agency of employment. . . . Each link in the chain must be admissible, either because it is an admission and thus not hearsay or under some other hearsay exception. . . . While there

> may be controversy over whether admissions must be based on personal knowledge, . . . <u>unattributed statements repeated by party-opponents cannot be admissible</u>. As the original declarant is unknown, it is impossible to determine whether the original declarant also fits within the party-opponent definition, and thus the exclusion of [the challenged statements] was proper.

<u>Vazquez</u> v. <u>Lopez-Rosario</u>, 134 F.3d 28, 34 (1st Cir. 1998) (emphasis added). Acco and Gar must establish that the chart prepared by UTC is grounded in admissible evidence.[37] They have not done so. The chart was prepared by UTC's lawyers and contained information UTC had developed from discovery, including inferences from third-party information. The chart also contained a number of unattributed statements. Acco and Gar have not attempted to identify the source of these statements or specify which of the statements might be admissible. Accordingly, we affirm the district court's decision to exclude the chart from evidence.

**4. Proof that Defendants' Waste Caused or Contributed to Cleanup Costs**

_____

[37] Summary charts offered pursuant to Fed. R. Evid. 1006, governing charts summarizing voluminous writings, must also be grounded in admissible evidence. <u>See</u> <u>United States</u> v. <u>Nivica</u>, 887 F.2d 1110, 1126 (1st Cir. 1989); <u>United States</u> v. <u>Sorrentino</u>, 726 F.2d 876, 884 (1st Cir. 1984) ("[P]urported summaries containing assertions not otherwise supported by the record are not admissible."). While Acco and Gar have not identified the master chart as a summary chart under Rule 1006, seeking to admit it as an admission of UTC instead, the master chart -- more than 100 pages long -- summarizes a large quantity of information, and whether it is deemed a party admission or a summary chart, Acco and Gar must prove that the statements in the chart are admissible.

Ashland and Acco argue that there is no evidence concerning the quality or quantity of hazardous substances in the Ashland and Acco drums found at the Davis site, and thus no evidence that disposal of the drums can cause UTC to incur cleanup costs. Gar makes two additional lack of causation arguments, contending that: (1) there is no evidence that the company contributed more than background levels of contamination since it was found liable for only five drums of waste; and (2) that its waste, which contained metals, has not contributed to UTC's soil remediation costs because the remediation is directed only at cleaning up volatile organic compounds. We review for clear error the court's factual finding that the appellants' waste triggered cleanup costs. See Dedham Water, 972 F.2d at 457.

In discussing the environmental damage at the Davis site, the district court found that three categories of waste were present in the soil and ground or surface water at greater than background levels:[38] "volatile organic compounds (VOCs), semi-volatile organic compounds (SVOCs), and metals." See Davis IV, 31 F. Supp. 2d at 51. The VOCs included "benzene, methyl ethyl ketone (MEK), methylene chloride, perchloroethylene a/k/a tetrachloroethylene (PCE), 1,1,1, tricloroethane (1,1,1-TCA), trichlorethylene (TCE), toluene, and

---

[38] The background level of a hazardous substance is measured in parts per million or parts per billion, and reflects the level that presents an acceptable degree of health risk, according to scientific judgments.

xylene." <u>Id.</u> The metals included "cadmium, copper, cyanide, and nickel." <u>Id.</u>

The court found that Acco, which manufactured controls for oil and gasoline lines, produced waste containing 1,1,1,-TCA, cadmium, copper, and nickel compounds, cyanide, and hydrochloric or sulfuric acid. <u>See</u> <u>id.</u> at 55. Ashland, a chemical manufacturer, generated waste that contained nitrating acid, composed of sulfuric acid and nitric acid, as well as solvents composed of isopropyl alcohol, methyl alcohol, toluene, benzene, and xylene. <u>See</u> <u>id.</u> at 56. Gar, which "was in the electroplating business," generated wastes containing nitric acid, copper, nickel, and cyanide. <u>Id.</u>

The court found that "[s]ince the hazardous waste deposited at the Davis site has been commingled into an essentially homogeneous 'witches' brew,' it is impossible to allocate discrete portions of the cleanup cost to any particular type of waste or any particular party." <u>Id.</u> at 64. As a result, the court made a general finding that "the evidence does establish hazardous substances produced by Acco-Bristol, Ashland, Gar, and Perkin-Elmer as well as Morton were deposited at the Davis Site, that each of them contracted for the disposal and that the release and threatened release of those kinds of substances triggered response costs." <u>Id.</u> at 62.

In finding that the appellants' waste contributed to UTC's cleanup costs, the district court drew a reasonable inference based on

the evidence.  Evidence about the defendants' manufacturing processes in 1976 and 1977 supports the finding that each defendant generated waste that contained one or more of the hazardous substances identified at the Davis site at concentrations exceeding background levels.  See id. at 51.  Evidence about the commingling of these substances in the water and soil at the site supports the finding that the harm caused by each individual substance could not be remediated separately. The court thus concluded that the defendants had caused or contributed to cleanup costs at the site.

The appellants' arguments to the contrary rely on a highly selective reading of Acushnet Co. v. Mohasco Corp., 191 F.3d 69 (1st Cir. 1999).    The passage they cite states:

> It might, of course, make sense to say that a defendant's release did not 'cause' the incurrence of response costs when the monies were expended for purposes wholly unrelated to responding to environmental contamination. And we suppose it may even be accurate to say that a generator or transporter of waste did not cause a plaintiff to incur remediation costs when that person did not actually cause any alleged contamination, or perhaps even where clean up efforts were directed at cleaning up toxins other than those attributed to the defendant.

Acushnet, 191 F.3d at 77 n.7 (citation omitted).  Based on this language, the appellants assert that CERCLA contribution plaintiffs must prove that a defendant's waste contributed more than background contamination levels and is the type of waste being cleaned up at the

site.  Their attempt to somehow raise the threshold for proving causation, however, misconstrues the holding of <u>Acushnet</u>.

In <u>Acushnet</u>, a settling defendant brought a contribution action against a non-settler.  The non-settler admitted that it had discarded waste containing a substance called PAH at the site in question, but moved for summary judgment on the ground that the quantity of PAH it disposed was far less than the background level and tiny in comparison to the amount of PAH dumped by other parties.  The district court granted summary judgment because the plaintiff failed to create a triable issue of fact about whether the defendant's disposal of PAH caused cleanup costs to be incurred.  We affirmed "on somewhat different grounds," saying that "[t]o the extent that the court's ruling may be interpreted to incorporate into CERCLA a causation standard that would require a polluter's waste to meet a minimum quantitative threshold, we disagree."  <u>Id.</u> at 72.  We explained:

> To read a quantitative threshold into the language 'causes the incurrence of response costs' would cast the plaintiff in the impossible role of tracing chemical waste to particular sources in particular amounts, a task that is often technologically infeasible due to the fluctuating quantity and varied nature of the pollution at a site over the course of many years.  Moreover, it would be extremely difficult, if not impossible, to articulate a workable numerical threshold in defining causation. . . . Our own decisions provide no basis for such an approach. . . . [W]e have never discussed CERCLA causation in quantitative terms.

<u>Id.</u> at 76-77.

To be sure, CERCLA allows a defendant to assert a defense that the liability attributable to it is divisible from that borne by other parties. See id. at 77 ("[W]here environmental harms are divisible, a defendant may be held responsible only for his proportional share of the response costs"). However, once the plaintiff has established that a defendant disposed of hazardous waste, Acushnet put the burden of proof on the defendant to show that this waste did not contribute to cleanup costs. See id. Other courts faced with the commingling of chemicals that inevitably occurs at many hazardous waste sites have followed a similar approach. See Tosco Corp. v. Koch Indus., Inc., 216 F.3d 886, 891 (10th Cir. 2000) ("The plaintiff in a CERCLA response cost recovery action involving multiple potentially responsible persons need not prove a specific causal link between costs incurred and an individual responsible person's waste."); Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930, 936 (8th Cir. 1995) ("[A] plain reading of [CERCLA] leads us to the conclusion that once a party is liable, it is liable for its share, as determined by Section 9613(f), of 'any' and all response costs, not just those costs 'caused' by its release."); United States v. Alcan Aluminum Corp., 964 F.2d 252, 264-66 (3d Cir. 1992); Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 670 n.8 (5th Cir. 1989) ("[I]n cases involving multiple sources of contamination, a plaintiff need not prove a specific causal link between costs incurred and an individual generator's waste.").

Neither Acco nor Ashland have any evidence to show that the many hazardous substances contained in their waste "constitute[] no more than background amounts of such substances in the environment and cannot concentrate with other wastes to produce higher amounts." Acushnet, 191 F.3d at 77. Gar also has no evidence to show that the copper, cadmium, and cyanide it generated are present below background levels.

Acushnet also disposes of Gar's additional arguments that its waste has not contributed to UTC's cleanup costs. Gar's contention that its five drums of waste were insufficient to contribute more than background levels of waste presupposes a minimum quantitative threshold for liability, which Acushnet rejected. See id. at 77.[39] Gar also argues that it should not have to pay for a cleanup directed at VOCs when its waste contained only metals. The record shows that while the EPA plan for the Davis site, which drives UTC's cleanup efforts, focuses primarily on VOCs, it also aims to mitigate the other pollutants present at the site. According to testimony at trial, UTC will have to take additional steps to reduce metal contaminants if those contaminants are still present in the soil at greater than

---

[39] The district court took Gar's relatively minor waste contribution into account by allocating to the company only .03 percent of UTC's cleanup costs. Gar itself calls this allocation "minuscule." At oral argument, it became apparent that the real concern of Gar and the other appellants is that the government will use the judgment against them here in a future § 9607 action for the costs of the groundwater and well remedies which have not yet been recovered.

background levels after VOC levels have abated. Gar thus has failed to show that the harm caused by its waste is divisible from the harm treated in UTC's soil remediation.

### 5. The Entry of a Declaratory Judgment under § 9613(g)(2) and the Declaratory Judgment Act

The appellants argue that the district court's entry of a declaratory judgment was improper because: (1) CERCLA does not provide for declaratory relief in a contribution action for future cleanup costs; and (2) the Declaratory Judgment Act does not provide for declaratory relief in this case because no case or controversy existed between the parties. To support the latter claim, the appellants argue that UTC failed to prove that it was likely to incur more than its fair share of future cleanup costs and that UTC's settlement with the government did not extinguish the appellants' liability.[40] We discuss each argument in turn.

The appellants argue that CERCLA's declaratory relief provision, § 9613(g)(2), does not permit UTC to receive declaratory

---

[40] The appellants also argue that UTC failed to request declaratory relief. This argument is easily disposed of. As the district court pointed out, UTC need not have used the magic word "declaratory judgment" in its pleading to put the defendants on notice that its claims could be resolved with a grant of declaratory relief. See Davis IV, 31 F. Supp. 2d at 60. UTC's complaint asked the court to enter a judgment to "determine . . . the equitable contribution share of liability . . . properly allocated to each [party.]" The court's case management order before trial used similar language. This language gave the defendants sufficient notice that declaratory relief might be granted.

relief for cleanup costs that it incurred after the close of discovery and continues to incur as it completes the soil remediation. They correctly point out that the amount that UTC will ultimately pay for soil remediation is unknown. While the EPA projected a cost of $14 million for soil remediation, this estimate is several years old. Rather than allowing into evidence more recent figures on the amount of ongoing and future cleanup costs, the court relied on the EPA estimates for purposes of the Phase III adjudication, saying that the defendants could challenge specific expenditures in post-trial proceedings.[41]

The district court dismissed UTC's claims for past cleanup costs on the ground that the company had not paid for any cleanup before the close of discovery.[42] See Davis III, 20 F. Supp. 2d at 330. The court expressed doubts about whether UTC was entitled to declaratory relief for future costs given the ongoing nature of the payments and their unknown total amount, but ultimately concluded that "the evidence presented is sufficient to enable the Court to make a meaningful allocation based upon the facts presently available." Davis

---

[41] The district court "retain[ed] jurisdiction for the purpose of revising this allocation if and when additional facts are discovered that were not reasonably available to the parties at the time of trial and that clearly demonstrate a change in circumstances so significant that the allocation would be rendered manifestly inequitable." Davis IV, 31 F. Supp. 2d at 69.

[42] UTC's indemnification claims were dismissed "for the same reason" and because the district court determined that UTC "was not entitled to indemnification under Rhode Island law." Davis IV, 20 F. Supp. 2d at 330.

IV, 31 F. Supp. 2d at 59.  The court thus granted declaratory relief pursuant to CERCLA, 42 U.S.C. § 9613(g)(2), and the Declaratory Judgment Act, 28 U.S.C. § 2201.

To determine whether the court's grant of declaratory relief was proper under § 9613(g)(2), we begin with the plain language of the statute.  See United States v. Rivera, 131 F.3d 222, 224 (1st Cir. 1997).  Section 9613(g)(2) provides that "[i]n any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  42 U.S.C. § 9613(g)(2).  The statute does not explicitly provide for declaratory relief for a contribution action for future or past response costs.  However, nothing in the statute precludes an interpretation that declaratory relief is available in both instances.  See Boeing Co. v. Cascade Corp., 207 F.3d 1177, 1191 (9th Cir. 2000).  The statute suggests this interpretation by adopting a flexible time line, providing that "[a] person may seek contribution . . . during or following any civil action under . . . section 9607(a) of this title."  42 U.S.C. § 9613(f)(1) (emphasis added).  This language anticipates that a defendant in a § 9607 cost recovery action may initiate a contribution action before its own liability is established.  Consistent with this scheme, a § 9607 defendant whose liability has been established may be awarded declaratory relief before

that liability has been fully discharged.

The district court acknowledged that a few courts have held that § 9613(g)(2) applies to actions brought under § 9607, the vehicle for an innocent party to recover cleanup costs, and not to actions brought under § 9613(f), the vehicle for a non-innocent party to seek contribution from other polluters.  See Davis IV, 31 F. Supp. 2d at 590 (citing Reichhold Chems., Inc. v. Textron, Inc., 888 F. Supp. 1116, 1123-24 (N.D. Fla. 1995) and Sun Co. v. Browning-Ferris, Inc., 919 F. Supp. 1523, 1532 (N.D. Okla. 1996), overruled in part by 124 F.3d 1187 (10th Cir. 1997)).  However, the Ninth and Tenth Circuits have taken the position, as we do here, that § 9613(g)(2), the declaratory judgment provision of CERCLA, applies to § 9613(f) contribution actions for both past and future response costs.  In Boeing Co. v. Cascade Corp., the Ninth Circuit said:

> CERCLA was intended to encourage quick response and to place the costs on those responsible. Declaratory relief serves these purposes because parties, like those in this case, will know their share of costs before they are incurred . . . . The costs and time involved in relitigating issues as complex as these where new costs are incurred would be massive and wasteful. Declaratory relief allocating future costs is therefore consistent with the broader purposes of CERCLA.

207 F.3d at 1191; see also Tosco Corp., 216 F.3d at 897 ("[W]here, as here, a responsible party chooses to go to trial and future response costs are likely to be incurred, but the exact amount remains unknown,

a judgment on proportional liability is an appropriate remedy.").[43] We agree with these rationales. As the district court said, in this case "allocation helps to alleviate the hardship that would be visited upon the [PRP] seeking contribution if that PRP was, in effect, required to finance the entire cleanup operation before getting a determination regarding the shares attributable to the other PRP's." Davis IV, 31 F. Supp. 2d at 58.

Since we find that § 9613(g)(2) applies to § 9613(f) contribution actions for both past and future response costs, we need not address in detail the appellants' arguments that the district court's entry of a declaratory judgment was improper under the Declaratory Judgment Act because there was no case or controversy permitting the court to act. We address the arguments only because they apply, at least by implication, to the availability of declaratory relief under § 9613(g)(2).

First, the appellants say that there was no controversy between the parties, as the Act requires, because UTC did not prove that it would pay more than its fair share of cleanup costs. They argue that UTC cannot prove that it is likely to pay more than its fair

_____

[43] Other courts have also reasoned that declaratory relief furthers CERCLA's goals in finding that the entry of such relief is mandatory in § 9607 cost recovery actions. See Dent v. Beazer Materials & Servs., Inc., 156 F.3d 523, 532 (4th Cir. 1998); Kelley v. E.I. DuPont De Nemours & Co., 17 F.3d 836, 844 (6th Cir. 1994) ("The fact that future costs are somewhat speculative is no bar to a present declaration of liability.") (internal quotation marks omitted).

share of cleanup costs because it began incurring those costs only shortly before trial and offered no evidence about the amount of those costs.

The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.  Here, the district court observed:

> the premise underlying UTC's request for a judgment 'determining . . . the equitable contribution share of liability for the site properly allocated to each [party]' is that, at some time in the future, it is likely that UTC will be required to pay more than its fair share of the alleged common liability; and, therefore, that it will be entitled to contribution from the defendants.

Davis IV, 31 F. Supp. 2d at 58 (alterations in original).  For the principle that a PRP seeking contribution must prove that it has paid more than its fair share, the court relied on United Tech. Corp. v. Browning-Ferris Indus., Inc., 33 F.3d 96, 100 (1st Cir. 1994) (holding that CERCLA allows a non-innocent party bringing a § 9613(f) action "only to seek recoupment of that portion of his expenditures which exceeds his pro rata share of the overall liability--in other words, to seek contribution rather than complete indemnity").  The district court set UTC's share as 1.54 percent of the total waste at the Davis site

based on the volume of its waste established by the evidence.  See

Davis IV, 31 F. Supp. 2d at 67.  The court translated this 1.54 percent

liability share into $754,600, using an estimate of $55 million for

total cleanup and enforcement costs.  See id. at 69.  Reasoning that

UTC was bound by the proposed consent decrees to pay at least $10.35

million, the court found that UTC had necessarily incurred more than

its fair share of cleanup costs.[44]  See id.

        The appellants' argument to the contrary fails for the same

reasons that led us to reject the argument that the district court had

no authority to enter a consent decree.  UTC's agreement in Consent

Decree I to make a cash payment and perform the soil remediation

created a fixed obligation subject only to the court's approval.  UTC

did not have to actually make the payments to which it agreed to show

that it was liable for more than its fair share of the total costs of

cleanup.  The ongoing nature of the work and the fact that its ultimate

cost was not known at trial did not affect the district court's ability

to consider the evidence that other PRPs contributed to the waste in

the soil, and to determine whether some of UTC's costs should thus be

allocated to them.

        The appellants also argue that there is no case or

---

[44] The court reached this figure by deducting the amounts that UTC
can recoup from other PRPs pursuant to the other partial consent
decrees from the $16.8 million it agreed to pay pursuant to Consent
Decree I.  We note without resolving the issue that the government sets
UTC's minimum payment at $9.3 million.

controversy between the parties because UTC has not extinguished their entire liability.  As we have discussed, the partial consent decrees do not cover an estimated $21.7 million of the government's projected response costs.  Because the government can still seek to recover those costs from them, the appellants argue that "[p]ermitting UTC to recover from the defendants under these circumstances would expose the defendants to the CERCLA equivalent of 'double jeopardy.'"  In support of their position, the appellants cite <u>United Techs. Corp.</u>, which defined the term "contribution" as "a claim by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make."  33 F.3d at 99 (internal quotation marks omitted).

The appellants' argument that UTC is not entitled to contribution because it has not extinguished the appellants' entire liability fails in light of the plain language of § 9613(f):

> A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding <u>matters addressed in the settlement</u>. . . . A person who has resolved its liability to the United States or a State <u>for some or all of a response action or for some or all of the costs of such action</u> in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to [above].

42 U.S.C. § 9613(f)(2) & (3)(B) (emphasis added).  CERCLA clearly anticipated that some settlements, like the one in this case, would

cover only a portion of the total cleanup costs for a hazardous waste site. The statute does not impose a requirement that a contribution action plaintiff must settle the entire cost of cleaning up a site before it can seek contribution.

The appellants' complaint that they may bear a disproportionate share of the total liability if the government chooses to bring further proceedings against them is part of the risk they assumed in choosing not to settle. As we have said before:

> CERCLA seeks to provide EPA with the necessary tools to achieve prompt cleanups. One such tool is the ability to foster incentives for timely settlements. To this end, 42 U.S.C. § 9613(f)(2) provides that a party who settles with the government 'shall not be liable for claims for contribution regarding matters addressed in the settlement.' Because only the amount of the settlement, not the pro rata share attributable to the settling party, is subtracted from the aggregate liability of the nonsettling parties, section 9613(f)(2) envisions that nonsettling parties may bear disproportionate liability. This paradigm is not a scrivener's accident. It was designed to encourage settlements and provide PRPs a measure of finality in return for their willingness to settle.

United Techs. Corp., 33 F.3d at 102-03 (citations and internal quotation marks omitted); see also Charles George, 34 F.3d at 1086 ("non-settling defendants . . . are potentially liable for the full difference between the costs of cleanup and the total amount paid by the settling PRPs"). While our precedents on CERCLA consent decrees are attentive to the fairness of the settlements for settling versus

non-settling PRPs, they do not go so far as to protect PRPs who choose not to settle from the consequences of non-settlement imposed by CERCLA itself.  See Charles George, 34 F.3d at 1088.  In sum, the district court's entry of a declaratory judgment was proper.

### 6. Morton's Liability

The district court found Morton International liable for hazardous waste dumped by Thiokol Corporation Chemical Division (Thiokol) at the Davis site.  For purposes of this case, Morton has stipulated that it is a successor to Thiokol's liabilities.

### a. Claims of Clearly Erroneous Factual Findings

Morton's liability, unlike that of other parties whose waste was hauled by CWR, depends on the court's findings about the waste practices of CCC.  Thiokol was one of the approximately 130 companies from whom CCC collected waste during 1976 and 1977.  Reasoning that since CCC made 47 deliveries to Davis, and since "there is no reason to believe that CCC handled Thiokol's waste any differently than the waste of its other 130 customers," the district court found that Thiokol's waste went to the Davis site, and thus found Morton liable as an arranger.  Davis IV, 31 F. Supp. 2d at 55.  However, because there was no evidence regarding the volume of Thiokol's waste transported by CCC, or the volume of waste from other customers that CCC transported to the Davis site, the court concluded that it was unable to allocate to

Morton a share of the cleanup costs.[45]  See id.

We begin with the evidence about CCC's practices.  CCC was located in Elizabeth, New Jersey and was owned and operated by William Carracino.  Carracino testified that CCC began sending waste to Rhode Island in 1977, initially to Sanitary Landfill.  Beginning in May, the Capuanos began diverting the CCC waste to the Davis site, and the CCC drivers proceeded straight there without stopping first at Sanitary Landfill.  CCC continued to bring waste to the Davis site until September, when Davis refused to accept the waste and seized CCC's truck because CCC was overdue in its payments.  Based on the 47 trips CCC made to the Davis site between May and the first week of July, and the volume of waste transported during those weeks, the district court estimated that CCC delivered a total of 441,450 gallons of waste to the Davis site.  Testimony by Carracino and CCC driver John Mayo about these trips to Rhode Island was corroborated by toll receipts and petty cash vouchers.

CCC began collecting Thiokol's waste in 1971.  This waste, generated by three separate plants in New Jersey, averaged approximately 22,000 gallons per year.  Much of the waste was identified on shipment forms prepared by Thiokol simply as

---

[45] As became clear at oral argument, Morton still appeals because of its concern that the government will use the judgment of liability in this case to pursue a § 9607 action for the cost of the groundwater and well remediation that remains unallocated.

"miscellaneous chemical waste."  Testimony by a former Thiokol employee indicated that Thiokol did not separate its waste.  In particular, Thiokol did not separate its chlorinated waste until 1979.  The waste was disposed of primarily in 55-gallon drums, but Thiokol used drums of smaller sizes, as well as 5-gallon pails.  The waste contained flammable liquids and spent solvents, including methylene chloride, methyl ethyl ketone (MEK), and 1,1,1-TCA, all of which were found at the Davis site.  Other waste picked up on a more occasional basis included urethane, filter cakes used in producing plasticizers, and lubricating oil.

CCC handled waste it collected in a variety of ways.  It sold some liquid waste to salvagers, burned some of the flammable liquids in an incinerator on the Elizabeth site, transported waste to various dump sites, and stored some waste on the premises for future disposal. Carracino testified that solid waste, polymers, and sludges were sent straight from CCC to disposal sites because of their tendency to clog the incinerator.  CCC employee John Prahm, who operated the incinerator, corroborated that testimony. Waste shipment forms confirm that CCC picked up polymers from Thiokol.

Evidence at trial indicated that CCC's incinerator did not effectively destroy many chemicals -- particularly chlorinated waste -- because it did not operate at a sufficiently high temperature.  An expert witness testified that the incinerator produced a sludge or

residue, which was itself a hazardous waste, because of this inefficient operation. Prahm testified that this residue from the incinerator was placed in drums for disposal. Evidence regarding Thiokol's disposal practices supports an inference that some of its flammable waste likely went to the Davis site as residue from the incinerator. More specifically, Thiokol did not separate chlorinated waste from unchlorinated waste, and chlorinated waste was not effectively destroyed in the incinerator because it required a higher temperature. Thus, we cannot conclude that the district court erred in finding that at least some of Thiokol's waste "consisted of flammable solvents that probably were incinerated," Davis IV, F. Supp. 2d at 55, and that because there is no basis for finding that Thiokol's waste was treated differently from other waste at CCC, the hazardous residue produced by the incineration of such waste was likely placed in drums and transported to the Davis site.

Thiokol's disposal of waste in 5-gallon pails further supports the district court's finding of liability. UTC offered the deposition testimony of a former Thiokol employee, Melvin Schulman, that Thiokol disposed of some liquid waste in spring-top, 5-gallon cans. Waste shipment forms indicate that CCC picked up these cans for disposal. A notation on at least one cancelled check drawn on CCC's account reads "5 gal. pails to RI, 6/8/77." Carracino confirmed in his deposition testimony that the notation was in his writing and that the

check was payment for dumping waste. Davis also testified at trial that he recalled receiving loads of waste in which 5-gallon pails, containing liquid waste, had been transported to his site on top of 55-gallon drums. Davis specifically recalled that these shipments came from New Jersey. While the testimony regarding these 5-gallon pails does not establish conclusively that Morton's waste was dumped at the Davis site, the district court was not clearly erroneous in crediting this testimony and considering it part of the evidence tending to establish that it was more probable than not that Morton's hazardous waste was shipped by CCC to the site.

Morton argues that "the mere presence of 1,1,1-TCA in Morton's waste and its presence at the Davis site does not, without more, establish that Morton's waste was located at the Davis site." However, the district court did not base its finding that Morton was liable solely on the presence of that chemical at the site. Rather, the district court inferred from other evidence that Thiokol's waste was taken to the Davis site and noted that such an inference "finds some support" in the fact that the chemical was found at the site. Davis IV, 31 F. Supp. 2d at 55.

### b. Claims of Legal Error

Morton argues that the district court improperly shifted the burden of proof to Morton, requiring it to show that it had not dumped waste at the Davis site, rather than requiring UTC to prove each

element of its claim for contribution. Morton cites <u>New Jersey Turnpike Auth.</u> v. <u>PPG Indus., Inc.</u>, 197 F.3d 96, 105 (3d Cir. 1999) for the proposition that UTC "must offer some proof that [the defendants] deposited, or caused the disposal of, [the waste] at each of the sites at issue in this case." Morton seems to construe this requirement of "some proof" as a requirement for direct, not circumstantial proof. However, for reasons explained above, UTC introduced adequate circumstantial evidence that Thiokol deposited waste at the Davis site. That circumstantial evidence distinguishes this case from <u>New Jersey Turnpike Authority</u>, where the plaintiff introduced no evidence regarding the transporters the defendants may have used and relied only on "the conceded large scale production of [the waste] by the appellees, the need for its local disposal, the proximity of the appellees' production facilities to the sites at issue, and the use of this material as fill over the years." <u>Id.</u> at 109. Here, UTC introduced evidence of Thiokol's production of hazardous waste, CCC's records regarding pickups of waste and deliveries to the Davis site, and CCC's practices in handling different kinds of waste. We do not agree with Morton that the district court engaged in an improper burden-shifting analysis in finding, based on this evidence, that some of Thiokol's waste was dumped at the Davis site.

Finally, Morton argues that it was impermissible for the district court to find it liable as an arranger because the court

declined to allocate to Morton a specific share of responsibility. However, Acushnet, 191 F.3d 69, precludes this argument. Acushnet emphasizes the broad discretion of a district court in allocating responsibility: "A court, in evaluating contribution claims under § 9613(f), is 'free to allocate responsibility according to any combination of equitable factors it deems appropriate.'" Id. at 78 (quoting O'Neil v. Picillo, 883 F.2d at 183). The district court here found that "the fairest, and most practical, measure of relative responsibility is the quantity or volume of hazardous waste attributable to each party." Davis IV, 31 F. Supp. 2d at 64. Because there was no way to calculate the volume of waste Thiokol dumped at the Davis site, the court declined to allocate a share of responsibility to Morton. This determination was well within the district court's broad discretion.

Morton argues that the district court's decision not to allocate a share of responsibility to Morton should have compelled a finding that Morton was not liable because Thiokol's waste could not be located and identified at the Davis site.[46] However, as we have noted, we said in Acushnet that there is no minimum quantity threshold for imposing liability on polluters, 191 F.3d at 76, adding that "[i]n an

_____

[46] Morton also claims that the district court erred in finding liability without applying a standard of "locating and identifying" its waste at the Davis site. We have already rejected an interpretation of § 9613(f) that would require an arranger's waste to be specifically located at the Davis site with direct evidence.

appropriate set of circumstances, a tortfeasor's fair share of the response costs may even be zero, id. at 78.  The district court's decision not to allocate responsibility to Morton is consistent with Acushnet, and Morton has not even attempted to explain why the principles of that opinion should not apply here.

### 7. Successor-in-Interest Liability for Gar

Black & Decker ("B & D") argues that the district court erred in finding that it, rather than Electroformers, Inc., is Gar's corporate successor-in-interest and thus liable for Gar's disposal of waste at the Davis site.  Gar's corporate history is as follows.  In 1977, MITE Corporation owned Gar Electroforming Division, the manufacturing facility in Danbury, Connecticut that generated the hazardous waste disposed of at the Davis site.  In November 1978, MITE agreed to sell Gar's assets to Electroformers, Inc., which had incorporated a month earlier.  The Asset Purchase Agreement signed by the parties in January 1979 provided that Electroformers would buy certain accounts receivable, furniture, fixtures, machinery, equipment, trademarks and trade names, business records, inventory and customer lists.  Electroformers used the name "Gar Electroformers Division" for a time after the sale, subleased the Danbury facility from MITE, and continued to make the same product with the same manufacturing process and to use the same employee pension plan.  MITE agreed not to compete with Electroformers in its area of business for ten years.  The Asset

Purchase Agreement provided that the "[b]uyer will not assume any of the liabilities of the Gar Electroforming Division existing on the date of the closing and MITE agrees to defend any claims relating thereto presented against Buyer and to save Buyer harmless from any such claims." MITE also represented that, to its knowledge, it was not in violation of any environmental or pollution-related law or ordinance. In 1985, the Emhart Corporation bought MITE. In 1989, B & D acquired Emhart, which continues to exist as B & D's wholly owned subsidiary.

UTC sued both B & D and Electroformers for contribution as Gar's successor-in-interest. Both defendants filed motions for summary judgment. The district court referred to a magistrate judge the question of which entity, B & D or Electroformers, should be liable as Gar's successor. The magistrate judge discussed the choice between the state law and federal common law tests for determining corporate successor liability, and found that B & D was liable under either analysis because Electroformers bought Gar's assets from MITE through a true assets purchase agreement. The district court adopted this recommendation.

On appeal, B & D argues that the federal common law "substantial continuation" test should determine corporate successor liability under CERCLA, and that Electroformers should be found liable using this test. Electroformers and UTC[47] argue that Connecticut's

_____

[47] UTC took the opposite position before the district court.

"mere continuation" test should apply,[48] and that Electroformers should not be found liable using either the "substantial continuation" or the "mere continuation" tests. We begin with the choice of law question, which we review de novo. See Kukias v. Chandris Lines, Inc., 839 F.3d 860, 861 (1st Cir. 1988).

The "mere continuation" test is an exception to the common law rule that the buyer of a corporation's assets (as opposed to its stock) does not incur liability for the divesting corporation's debts. See Ed Peters Jewelry Co. v. C & J Jewelry Co., 124 F.3d 252, 266 (1st Cir. 1997). The test is designed to protect creditors from sales that seek to evade valid claims. See id. Successor liability is an equitable doctrine, and courts traditionally consider five factors: (1) the divesting corporation's transfer of assets; (2) payment by the buyer of less than fair market value for the assets; (3) continuation by the buyer of the divesting corporation's business; (4) a common officer of the buyer and divesting corporations who was instrumental in the transfer; and (5) inability of the divesting corporation to pay its debts after the assets transfer. See id. at 268.

The federal "substantial continuation" test, which has been adopted in past cases by a few circuits, see B.F. Goodrich v. Betkoski, 99 F.3d 505, 519 (2d Cir. 1996); United States v. Carolina Transformer

---

[48] The Asset Purchase Agreement calls for application of Connecticut law, and the parties do not argue that another state's law should apply.

Co., 978 F.2d 832, 837 (4th Cir. 1992), requires courts to consider eight factors: "(1) retention of the same employees [by the buyer]; (2) retention of the same supervisory personnel; (3) retention of the same production facilities in the same location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the buyer holds itself out as a continuation of the" divesting corporation, Carolina Transformer Co., 978 F.2d at 838. In general, before creating a federal rule courts must consider whether federal interests require a nationally uniform body of law, whether applying state law would frustrate or conflict with a specific federal objective, and the extent to which a federal rule would disrupt commercial relationships predicated on state law. See United States v. Kimbell Foods, Inc., 440 U.S. 715, 728-29 (1979). In adopting the "substantial continuation" test, courts have cited CERCLA's "broad remedial purpose" and the "importance of national uniformity." See B.F. Goodrich, 99 F.3d at 519; Carolina Transformer Co., 978 F.2d at 837.

Other courts, however, have rejected the need for a federal test. See, e.g., Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489, 1501-02 (11th Cir. 1996); City Mgmt. Corp. v. U.S. Chem. Co., Inc., 43 F.3d 244, 253 n.12 (6th Cir. 1994). These cases heed the Supreme Court's warnings that courts should presume that matters left unaddressed are subject to state law when a "comprehensive and

detailed" federal statutory regime is at issue, and that cases in which the creation of a "special federal rule would be justified" generally are "few and restricted." See O'Melveny & Meyers v. Fed. Deposit Ins. Corp., 512 U.S. 79, 85 & 87 (1994).

We have concluded that the majority rule is to apply state law "so long as it is not hostile to the federal interests animating CERCLA," and have applied Massachusetts contracts law to determine an issue of successor liability. John S. Boyd Co., Inc. v. Boston Gas Co., 992 F.2d 401, 406 (1st Cir. 1993). Recent Supreme Court precedent confirms that Boyd's approach is correct. The Court applied state corporation law in a recent CERCLA case involving the potential liability of a parent corporation for its subsidiary and left little room for the creation of a federal rule of liability under the statute. See United States v. Bestfoods, 524 U.S. 51, 63 (1998) ("CERCLA is . . . like many another congressional enactment in giving no indication that the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute.") (internal quotation marks omitted). The Court's statements in Bestfoods and O'Melveny demonstrate that to justify the creation of a federal rule, "there must be a specific, concrete federal policy or interest that is compromised by the application of state law." Atkison, Topeka & Santa Fe Railway Co. v. Brown & Bryant, Inc., 159 F.3d 358, 363-64 (9th Cir. 1998) (internal quotation marks omitted).

We see no evidence that application of state law to the facts of this case would frustrate any federal objective. Connecticut's "mere continuation" test thus is the correct test for determining successor liability for the hazardous waste disposed by Gar.

In applying the "mere continuation" test, the magistrate judge recommended successor liability for B & D rather than Electroformers based on the following facts: (1) MITE and Electroformers did not share a common officer or director who was involved in the transfer; (2) MITE received fair compensation for Gar; (3) MITE continued to operate its other businesses; (4) MITE remained financially viable.[49] B & D did not challenge these factual findings, but objects to the magistrate's conclusion that Electroformers purchased Gar's assets through a true asset purchase agreement on the grounds that Electroformers shared certain commonalities with Gar and essentially continued its business. In support of this position, B & D notes that Electroformers made the same product that Gar made when MITE owned it, employed the same supervisory employees, used the same production facility and the same customer base, and initially operated under Gar's name.

The facts emphasized by B & D do not outweigh those cited by the magistrate judge to support the finding that Electroformers merely

_____

[49] The magistrate judge also found B & D liable under the federal law "substantial continuation" test. Because we apply the state law test, we do not reach this issue.

bought Gar's assets from MITE. MITE's receipt of fair compensation for the Gar division and the lack of common officers and directors between the two entities indicate that its sale of Gar's assets to Electroformers was an arms-length deal. Moreover, MITE continued as a financially viable business following the sale, leaving little reason to except it from the rule that successor liability does not transfer when one company buys another's assets. See Ricciardello v. J.W. Gant & Co., 717 F. Supp. 56, 59 (D. Conn. 1989) ("A sale of assets by one corporation to another, in good faith and for valuable consideration, does not impose any liability on the buyer for the debts of another.") (citing Davis v. Hemming, 127 A. 514, 518 (Conn. 1925)). The district court did not err in adopting the magistrate judge's recommendation imposing successor liability on B & D rather than Electroformers.[50]

### 8. UTC's Appeal

#### a. The Judgment in Favor of Macera

After UTC rested its case, the district court rendered a bench decision granting judgment as a matter of law pursuant to Fed. R. Civ. P. 52(c) in favor of BFI and Macera. Macera Brothers Container

---

[50] B & D also argues that the magistrate judge's recommendation of successor liability for B & D rather than for Electrofomers conflicts with the magistrate judge's recommendation of successor liability for BFI, the purchaser of Macera. Since the district court did not adopt the magistrate judge's recommendation of liability for BFI, any disparity between the two recommendations, if there is one, lacks legal significance.

Service, Inc.[51] hauled waste to various facilities for disposal. Michael Macera and Robert Cece were two principals in the corporation. BFI Waste Systems of North America, Inc. is in this action only as successor to Macera.[52]

The court explained its reasons for the judgment in a written memorandum and order after the trial concluded. See Davis III, 20 F. Supp. 2d at 329.[53] UTC appeals this ruling on two grounds. First, UTC claims that it proved Macera was liable as a transporter under CERCLA. Second, UTC argues that it proved Macera was liable as an arranger of hazardous waste, and that its claim of liability on this theory was timely asserted. Finally, BFI argues that if this Court finds that the district court erred in granting the judgment in favor of BFI and Macera, BFI is still not liable because it is not Macera's corporate successor. For the reasons that follow, we affirm the district court's judgment on partial findings in favor of BFI and do not reach BFI's

---

[51] Macera Brothers Container Service, Inc. changed its name to Macera Disposal, Inc. in 1984. In 1987, Macera Disposal was merged into M & C Enterprises, Inc. BFI purchased the assets of M & C Enterprises in July 1987.

[52] We will refer collectively to Macera Brothers Container Service, Michael Macera, Robert Cece, and BFI as "Macera" when discussing the claims regarding transporter and arranger liability.

[53] We review for clear error the factual findings made as part of the district court's judgment on partial findings. "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." Fed. R. Civ. P. 52(a) (emphasis added). See also Touch v. Master Unit Die Prods., Inc., 43 F.3d 754, 757 (1st Cir. 1995).

claim regarding successor liability.

## 1. Transporter Liability

CERCLA imposes transporter liability on "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites <u>selected by such person</u>" from which there is a release of hazardous substances. 42 U.S.C. § 9607(a)(4) (emphasis added). Noting that the statute itself does not define the term "selected," the district court in this case stated: "a person 'selecting' a site is a person who chooses that site from a group of possible sites." <u>Davis III</u>, 20 F. Supp. 2d at 333. Adopting a standard of "[a]ctive and substantial participation," the court ruled that "determining whether, or to what extent, a transporter made or actively participated in the site selection decision turns on the nature of the dealings between the transporter and the generator." <u>Davis III</u>, 20 F. Supp. 2d at 333-34. The court found that UTC had failed to present sufficient evidence regarding the negotiations between Macera and the generators for whom it hauled waste. Moreover, because there was evidence that some of the waste hauled by Macera came from UTC, the court found that UTC should have presented evidence regarding its own dealings with Macera in order to prove that Macera actively participated in the selection of the Davis site for UTC's waste. See <u>Davis III</u>, 20 F. Supp. 2d at 334.

The district court applied the correct legal standard in

determining whether Macera is a transporter under CERCLA. See Tippins

Inc. v. USX Corp., 37 F.3d 87, 94 (3d Cir. 1994). In Tippins, the

court stated:

> [W]e believe that a person is liable as a
> transporter not only if it ultimately selects the
> disposal facility, but also when it actively
> participates in the disposal decision to the
> extent of having had substantial input into which
> facility was ultimately chosen. . . The
> substantiality of the input will be a function,
> in part, of whether the decisionmaker relied upon
> the transporter's special expertise in reaching
> its final decision.

37 F.3d at 94-95 (citation omitted). See also B.F. Goodrich, 99 F.3d

at 520; United States v. USX Corp., 68 F.3d 811, 820 (3d Cir. 1995).

In contrast to a transporter who actively participated in the selection

of a site, Tippins described circumstances where a transporter that

merely followed the orders of a generator would not be liable:

> We emphasize that for liability to attach, a
> transporter must be so involved in the selection
> process that it has substantial input into the
> disposal decision. A transporter clearly does
> not select the disposal site merely by following
> the directions of the party with which it
> contracts. . . . In such cases, the transporter
> is no more than a conduit of the waste and its
> connection with the material is the most
> attenuated among potentially responsible parties.
> . . . Congress intended such transporters to
> avoid liability.

37 F.3d at 95 (citations and internal quotation marks omitted). See

also Interstate Power Co. v. Kansas City Power & Light Co., 909 F.

Supp. 1284, 1289 (N.D. Iowa 1994) (granting summary judgment to party

alleged to be a transporter where evidence showed the party had no discretion in hauling waste to the site but merely followed the orders of a waste generator). Thus, <u>Tippins</u> distinguishes between transporters that actively participate in the selection decision or have substantial input in that decision, and transporters that merely follow the directives of the generator. UTC has not explained why we should not follow the approach in <u>Tippins</u>. Accordingly, we examine the facts to determine whether the district court was clearly erroneous in concluding that Macera did not actively participate in the decision to transport waste to the Davis site.

The only evidence of Macera's participation in selecting the Davis site was the testimony of William Davis regarding his dealings with Robert Cece. Davis testified that he had known Cece for a long time, and that Cece visited the site on one occasion to discuss the possibility of dumping waste there. Davis also stated that he was paid by Macera for this dumping. The following excerpt from the district court's opinion summarizes its reasoning regarding the inferences that could be drawn from this evidence:

> The fact that Cece approached Davis and made arrangements to dump at the Site could support a reasonable inference that Cece actively and substantially participated in the selection of the Site. On the other hand, it also would be reasonable to infer that Cece was acting at the direction of UTC, the generator of the waste. Ordinarily, the former inference might be more plausible. However, under these circumstances, its plausibility is eroded by the dearth of

> evidence regarding the dealings between the
> Macera defendants and UTC.

<u>Davis III</u>, 20 F. Supp. 2d at 334. The district court's determination on this matter is essentially a refusal to choose between two equally plausible inferences where there is no reason to support one inference over the other. Because rulings under Rule 52(c) are reviewed for clear error, <u>see</u> Fed. R. Civ. P. 52(a), we defer to the district court's decision not to draw any inference.

In an attempt to evade the clear error standard of review for factual findings of the district court, UTC claims that the district court made an error of law by impermissibly drawing an adverse inference regarding UTC's failure to present evidence of its negotiations with Macera about the hauling of its waste. UTC quotes the following language from the court's written opinion in support of this claim:

> Since evidence of the dealings between UTC and the Macera defendants was readily available to and under the control of UTC, UTC's failure to present that evidence or to explain why it was unable to do so, gives rise to an inference that the evidence would have been unfavorable to UTC. . . . In short, the absence of evidence regarding the Macera defendants' dealings with UTC and the fact that such evidence was within UTC's control cause this Court to find that UTC has failed to establish that Macera Brothers 'selected' the Davis Site.

<u>Davis III</u>, 20 F. Supp. 2d at 334 (citation omitted). The case cited by the district court in support of this inference provides that two

conditions must be satisfied before an adverse inference about the non-production of evidence may be drawn.  See Commercial Ins. Co. v. Gonzalez, 512 F.2d 1307, 1314 (1st Cir. 1975).  The evidence must be "specially available" to the non-producing party, and that party must have "had some reason to suppose that non-production would justify the inference."  Id.  UTC argues that "specially available" means evidence within its control but not within the control of Macera.  Thus, UTC claims that the inference cannot apply in this case because Macera also has knowledge of any negotiations between Macera and UTC regarding the disposal of UTC's waste.  Cf. Kean v. Comm'r of Internal Revenue, 469 F.2d 1183, 1187 (9th Cir. 1972) ("Where a potential witness is equally available to both parties, no inference should be drawn from the failure of a party to call such witness.").

We conclude that UTC, with its reliance on the "adverse inference" argument, misses the essential point of the district court's analysis.  The district court expressed its concern over UTC's overall failure to present any evidence whatsoever about Macera's relationship with generators -- both UTC and other unidentified parties -- for whom it hauled waste.  Several paragraphs before discussing the inference drawn against UTC, the court stated: "UTC has failed to present sufficient evidence regarding those dealings [between Macera and generator defendants] to sustain its burden of proving that Macera Brothers 'selected' the Davis Site." Davis III, 20 F. Supp. 2d at 334.

The district court's conclusion about the insufficiency of the evidence at this point in its analysis makes the propriety of the adverse inference irrelevant. The court found against UTC simply because UTC failed to meet its burden of proof. In light of that finding, any adverse inference that might be drawn from UTC's failure to produce evidence of its own negotiations with Macera was not necessary to the district court's conclusion. We conclude, therefore, that the district court did not rely improperly on an adverse inference and affirm its finding that UTC did not present sufficient proof that Macera selected the Davis site.

## 2. Arranger Liability

UTC also argues that it proved that Macera was liable as an arranger of waste under CERCLA. Macera claims that UTC's assertion of an arranger claim is untimely. In the 1991 third-party complaint originally naming Macera as a defendant, UTC alleged only that Macera was liable as a transporter of waste. The district court entered a case management and scheduling order in December 1995 providing that "[a]ll cross-claims and counterclaims are deemed made and denied, except that contractual claims for indemnity must be specifically plead." The order also specified that amendments to third-party complaints had to be filed before January 2, 1996.

After the case was transferred to Chief Judge Torres, he entered an order in January 1998 providing:

On December 14, 1995, an order was entered providing that all parties were deemed to have asserted claims, cross-claims and counterclaims against all other parties for contribution and/or indemnity without the need for specifically pleading such claims.

Whereas it is impossible to determine what parties, in fact, are asserting such claims, the nature of any such claims or the basis for any such claims . . .

it is hereby ORDERED that on or before February 15, 1998, each party asserting a claim, cross-claim or counterclaim for contribution and/or indemnity shall, if such party has not already done so, file and serve pleadings setting forth such claim. Such pleadings shall specify the precise nature and basis of each claim asserted.

Relying on that order, UTC filed an amended third-party complaint against Macera, alleging for the first time that Macera was also liable as an arranger. In its answer, Macera objected to this amendment as untimely. For reasons that are unclear, the issue of whether UTC timely pled an arranger claim against Macera was not resolved before trial. However, the district court addressed this dispute during oral argument on Macera's Rule 52 motion for judgment after UTC rested its case. When UTC's lawyer first mentioned arranger liability, the following exchange occurred:

THE COURT: Arranger didn't come into this until much later. There is nothing about, there is no arranger liability theory pled in the original complaint against Cece, was there?

UTC'S COUNSEL: There was no arranger liability pled in our original complaint. We did take

- 106 -

> advantage of Your Honor's invitation to correct
> the pleadings in [January].
>
> THE COURT: Not correct the pleadings, not to
> correct the pleadings. Make it clear who was
> asserting claims against whom, that was the -

After additional discussion on the issue, the district court stated:

> And I certainly don't think that the attempt to
> include the arranger theory in the specific
> claims that the Court required parties to assert
> just before the case went to trial, I don't think
> that that invitation or requirement that the
> parties plead their - let the Court know who they
> were asserting claims against constituted a
> license to amend the pleadings and raise new
> theories, and there is no question that arranger
> liability is significantly different from hauler
> liability.

Thus, the district court ruled that its order of January 1998 did not authorize UTC to assert a belated claim of arranger liability. We defer to this interpretation because the district court was uniquely positioned to explain the meaning of its own pretrial order. See Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked & Abandoned Steam Vessel, 833 F.2d 1059, 1066-67 (1st Cir. 1987) ("We have noted before the special role played by the writing judge in elucidating the meaning and intendment of an order which he authored."); Lefkowitz v. Fair, 816 F.2d 17, 22 (1st Cir. 1987) ("[U]ncertainty as to the meaning and intendment of a district court order can sometimes best be dispelled by deference to the views of the writing judge."). We reject UTC's argument that the order authorized it to amend its complaint.

- 107 -

Next, UTC argues that the district court erred in denying UTC permission to amend its complaint to conform to the evidence offered at trial. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Fed. R. Civ. P. 15(b). "Such late pleading amendments may be allowed under Rule 15(b) at the discretion of the court, but only to the extent that the party opposing the amendment will not be unduly prejudiced." Campana v. Eller, 755 F.2d 212, 215 (1st Cir. 1985) (emphasis added). Where the party seeking amendment of the pleadings has shown no justification for its delay in doing so, we have affirmed the trial court's ruling to deny the amendment. See id. at 216. UTC has not even attempted to explain its failure to amend the pleadings at an earlier date.

Still, UTC argues that we should reverse the district court's determination on this issue because Macera did not suffer prejudice as a result of UTC's untimely pleading of the arranger claim. UTC insists that "the evidence admitted to prove 'transporter' liability was no different than the proof that established 'arranger' liability." However, any lack of prejudice to Macera is irrelevant because the district court gave other reasons for its ruling. We consider prejudice to the non-moving party as one factor to be weighed in permitting an untimely amendment to the pleadings. See, e.g., Campana, 755 F.2d at 215. In other words, a finding that the non-moving party

would not be prejudiced by an untimely amendment does not compel a determination that the amendment is appropriate.

UTC also argues that Macera consented to being tried as an arranger by failing to object to evidence tending to establish arranger liability at trial. The district court rejected this claim, citing its recollection that Macera had objected to the use of the term "arranger." We affirm this determination. "Consent to the trial of an issue may be implied if, during the trial, a party acquiesces in the introduction of evidence which is relevant only to that issue." DCPB, Inc. v. City of Lebanon, 957 F.2d 913, 917 (1st Cir. 1992) (emphasis added). As just noted, UTC asserted that Macera would not be prejudiced by a ruling that it consented to being tried as an arranger because the evidence proving Macera's liability as an arranger of hazardous substances was the same evidence proving Macera's liability as a transporter. This argument about lack of prejudice forecloses UTC's claim regarding trial by consent: "The introduction of evidence directly relevant to a pleaded issue cannot be the basis for a founded claim that the opposing party should have realized that a new issue was infiltrating the case." Id. Where, as here, the evidence regarding Macera's transport of waste to the Davis site was directly relevant to transporter liability, and, according to UTC, arranger liability, we find no error in the court's conclusion that Macera did not consent to being tried on an arranger theory by not objecting to the admission of

that evidence.[54]

### b. The Judgment in Favor of the City of New Jersey

UTC brought a contribution claim against the City of New Jersey (Jersey City) for disposing of approximately 2,000 drums abandoned on a city pier and containing corrosive, toxic and flammable substances found at the Davis site.  The district court found Jersey City immune from liability under § 9607(d)(2) of CERCLA, which provides immunity for local governments from costs and damages resulting from their emergency response to the potential release of hazardous substances.[55]  See Davis III, 20 F. Supp. 2d at 335.  On appeal, UTC argues that the district court erred in applying § 9607(d)(2) by failing to consider whether Jersey City voluntarily removed the 2,000

---

[54] Even if we concluded that UTC introduced evidence that was relevant only to prove that Macera was liable as an arranger, we agree with the district court's determination that Macera did not acquiesce to being tried on that theory.  As the district court noted in its ruling from the bench, Macera objected to the use of the word "arranger" at least twice during the trial.

[55] Section 9607(d)(2) provides:

No state or local government shall be liable under this Title for costs or damages as a result of actions taken in response to an emergency created by the release or threatened release of a hazardous substance generated by or from a facility owned by another person.  This paragraph shall not preclude liability for costs or damages as a result of gross negligence or intentional misconduct by the State or local government.  For the purposes of the proceeding sentence, reckless, willful, or wanton misconduct shall constitute gross negligence.

42 U.S.C. § 9607(d)(2).

- 110 -

drums.

The facts relating to Jersey City's waste disposal are not disputed. On a night in February 1977, Jersey City police caught Perk Chemical Company dumping waste at an abandoned city warehouse at a pier on the Hudson River. After police discovered approximately 2,000 drums of waste, the city secured the warehouse. City officials quickly contacted the New Jersey Department of Environmental Protection (DEP), which determined that the drums contained potentially explosive hazardous chemicals that could cause serious environmental harm. Both Jersey City and the New Jersey DEP agreed that the waste required prompt disposal, but disputed who should finance the cleanup.

Two weeks later, the DEP obtained a judgment ordering Jersey City to fund the cleanup. After contacting state-recommended contractors and expediting the normal bidding process, the city quickly hired a contractor to remove the waste. Within a few weeks all of the waste was successfully removed from the warehouse. The contractor hired by the city subcontracted with CCC to transport the waste for disposal.

UTC argues that the statute contains a requirement of voluntary action that Jersey City did not satisfy because it only acted to dispose of the drums after the state obtained a judgment ordering the city to pay for the cleanup.[56] We review the district court's

[56] UTC also argues that Jersey City is not exempt because it owned the pier warehouse in which the waste was dumped, meaning that the waste cannot be "from a facility owned by another person," as the

application of § 9607(d)(2) de novo.  See Rivera, 131 F.3d at 224.  To construe the statute, we look at its plain language.  See id.  If the meaning of the language is clear, our inquiry need go no further.  See id.  We construe the statutory language within the context of CERCLA as a whole.  See id. at 225;  Conroy v. Aniskoff, 507 U.S. 511, 515 (1993) ("[T]he meaning of statutory language, plain or not, depends on context.").

According to the plain language of § 9607(d)(2), state and local governments are immune except in cases where their handling of the waste amounts to "gross negligence or intentional misconduct." Although UTC concedes that Jersey City was not grossly negligent and did not engage in intentional misconduct, it argues that CERCLA's broad remedial purpose requires us to read a voluntariness requirement into the statute.

There is nothing in the plain language of § 9607(d)(2) that supports UTC's argument.  Indeed, UTC seeks to add to the statutory language on policy grounds.  There is no basis for doing so.  This is not the rare case in which applying the plain language of the statute will produce an absurd or irrational result, Conservation Law Found. v. Busey, 79 F.3d 1250, 1267 (1st Cir. 1996), or one that is "demonstrably at odds with the intention of its drafters," United States v. Ron Pair

---

statute requires.  42 U.S.C. § 9607(d)(2).  However, the statute also offers immunity if the hazardous waste at issue was "generated by . . . another person," as was the case here.  Id.

<u>Enters.</u>, 489 U.S. 235, 242 (1989).[57]  We thus affirm the district court's ruling that Jersey City is immune from liability under § 9607(d)(2).

### c. The Government's $6 Million Enforcement Costs

UTC appeals the district court's apparent ruling that it is solely responsible for $6 million in government enforcement costs, arguing that the ruling is "insufficiently clear for purposes of the application of estoppel and res judicata," and that there is no competent evidence to support the conclusion that UTC caused all of the government's enforcement costs.  The appellants respond that the court "properly exercised its discretion in allocating $6 million in government enforcement costs to UTC," either based on equitable contribution or divisibility principles, and that there is evidence in the record to support this ruling.

The "enforcement costs" at issue are the government's expenditures for litigating the cost recovery action against UTC and the other original eight defendants through the Phase I trial against

---

[57]  Our application of the statute is consistent with the 6th Circuit's opinion in <u>United States</u> v. <u>Cordova Chem. Co.</u>, 113 F.3d 572 (6th Cir. 1997), vacated on other grounds <u>sub</u> <u>nom</u> <u>United States</u> v. <u>Bestfoods</u>, 524 U.S. 51 (1998).  In <u>Cordova</u>, the 6th Circuit found the Michigan Department of Natural Resources immune from liability under § 9607(d)(2) for the costs of a hazardous waste site cleanup.  <u>See</u> <u>id.</u> at 582.  We note that the facts of <u>Cordova</u> indicate that the Michigan department received immunity for an emergency response that was considerably less efficient and effective then Jersey City's here.

UTC.[58]   The district court made two statements about UTC's

responsibility for these costs.  In its September 28, 1998 judgment

based on partial findings, the court said:

> In this case, calculating UTC's pro rata share of
> the total response costs requires that the
> enforcement cost component and the cleanup cost
> component be considered separately.  The $6
> million in enforcement costs is attributable,
> almost entirely, to the Phase I litigation
> between the government and UTC.  The defendants
> did not participate in that phase of the
> litigation and it was necessitated because UTC
> denied that any of its waste was deposited at the
> Davis site.  Accordingly, UTC bears 100% of the
> responsibility for those enforcement costs.

Davis III, 20 F. Supp. 2d at 338.  The court also discussed the issue

of enforcement costs in its December 15, 1998 declaratory judgment,

saying:

> It appears that the [$6 million] enforcement
> costs are attributable almost entirely to
> expenses incurred by the government in the Phase
> I litigation against UTC, and that, therefore,
> they should be borne entirely by UTC.  However,
> that issue need not be decided in order to
> determine the likelihood that UTC will be
> required to pay more than its fair share.

_____

[58] The parties do not contest that $6 million is an accurate
estimate of the amount of the government's costs to that point.
However, UTC argues that the precise figure for the costs --
$5,855,812.01, according to the government's written submission in
support of entry of its consent decree with UTC and other settling
parties -- as well as other evidence about who bears responsibility for
these costs comes from the consent decree proceedings, and so is not
part of the record in the declaratory judgment appeals.  Because we
remand to the district court for clarification, we do not reach this
issue.

<u>Davis IV</u>, 31 F. Supp. 2d at 69.  The court denied UTC's motion seeking amendment or clarification of these statements.

UTC argues that the "the equivocal language that the district court used and the context of the issue it was deciding indicate it was only engaging in a presumption, based on extra-record evidence, to test whether it should issue declaratory relief." It asks us to construe the court's statements as "argumentative presumptions without preclusive effect."

We agree that the intended effect of the court's statements is insufficiently clear.  The court discussed UTC's responsibility for the government's enforcement costs only in terms of its assessment of whether UTC paid more than its fair share of the total response costs for the Davis site.  On the one hand, the court's initial statement that "UTC bears 100% of the responsibility for those enforcement costs" suggests that the court may have intended a ruling that obligates UTC to pay the government $6 million on top of the payments agreed to in the settlement.  On the other hand, the court's later statement that the issue of UTC's responsibility for the costs "need not be decided" suggests that the court ultimately refrained from reaching this question.

Moreover, it is not clear how the court's statements fit with its other Phase I and Phase III rulings.  Did the court intend merely to restate the joint and several liability findings against UTC

following the Phase I trial, which indisputably included liability for an estimated $49 million in cleanup costs and $6 million in enforcement costs?[59] Or did the court intend to allocate the enforcement costs to UTC, irrespective of the consent decree settlement and the finding that UTC should bear 1.54 percent share of the total liability?

The appellants argue that an equitable allocation to UTC of the government's enforcement costs would lie within the district court's broad discretionary authority under CERCLA. See Acushnet, 191 F.3d at 77. However, we are not willing to assume that the court made such a finding of causation or equitable allocation without a more complete explication. As a result, we instruct the district court on remand to explain the intended effect of its statements about UTC's responsibility for the government's enforcement costs.[60] In remanding for clarification of this issue, we do not retain jurisdiction of the case. See Clauson v. New England Ins. Co., 254 F.3d 331, 342 (1st Cir.

---

[59] By order of May 5, 1995, UTC was adjudged liable for "all unreimbursed costs that have been incurred by the United States of America related to the Davis Liquid Waste Site."

[60] This remand does not disturb the district court's finding that UTC paid more than its fair share of the total enforcement costs. As we have noted, the court translated UTC's 1.54 percent share of liability into $754,600 and said that UTC will pay the government at least $10.35 million after contribution is received from the settling third and fourth-party defendants. Thus "even if the $6 million in enforcement costs is viewed as an additional part of UTC's contribution threshold, the threshold clearly is exceeded by UTC's settlement obligation of at least $10.35 million." Davis IV, 31 F. Supp. 2d at 69.

2001).

## IV. Conclusion

As a final note, we wish to acknowledge the district court's careful attention to this unusually complex case. Its skillful management of the case and its cogent decisions over many years considerably aided our disposition of this ganglion of appeals.

For all of the reasons discussed herein, we affirm the determinations of the district court, with the exception of that concerning the issue of whether UTC is solely responsible for $6 million in government enforcement costs. On that issue, we remand for a clarification of the district court's position. Each party is to bear its own costs.

**So ordered.**

## A Roster of Parties, Principals, and Witnesses

Acco-Bristol:               defendant found liable for dumping

Ashland:                  defendant found liable for dumping; also appeals the consent decrees

BFI:                      alleged to be corporate successor of Macera Brothers; won judgment on partial findings at the close of UTC's evidence

Black & Decker:        found to be corporate successor of Gar

Anthony Capuano:       principal of Sanitary Landfill

Jack Capuano:          principal of Sanitary Landfill

William Carracino:     principal of CCC

Robert Cece:           principal of Macera Brothers

Chemical Control
Corporation (CCC):     waste hauler located in New Jersey

Chemical Waste
Removal (CWR):       waste hauler located in Connecticut

William Davis:         owner of the Davis site

Electroformers:        found not to be corporate successor of Gar

Johnny Granfield:    driver for CWR

Wilbert Jones:         driver for CWR

Macera Brothers:       waste hauler that dumped at the Davis site; won judgment on partial findings at the close of UTC's evidence

John Mayo:              driver for CCC

Morton:                 defendant found liable for the dumping of Thiokol; acknowledges successor

liability for Thiokol

Emanuel Musillo:          principal of CWR

Michael Musillo:          principal of Drum Automation, CWR's corporate successor

City of New Jersey:       won judgment on partial findings at the close of UTC's evidence

Perkin-Elmer (PE):        defendant found liable for dumping

John Prahm:               employee of CCC

Qualitron:                corporation that dumped at the Davis site; PE acknowledges successor liability for Qualitron

Sanitary Landfill:        landfill where CWR and CCC dumped waste before dumping at the Davis site

United Technologies
Corporation (UTC):        found liable in Phase I; sued third and fourth-party defendants in Phase III

**A Summary of Relevant Monetary Sums**

Estimated Total Cost: $55 million

Initial EPA  response costs: $19 million
Initial DOJ enforcement costs: $6 million
Soil remediation: $14 million
Groundwater cleanup: $13 million
Water line extension: $3 million

**Phase I**

Partial Consent Decree: approximately $5.625 million

Clairol: $3 million, plus interest
Pfizer: $1.5 million, plus interest
Providence Journal: $650,000, plus interest
Ciba-Geigy: $475,000, plus interest

**Phase II**

Consent Decree I: $13.5 million, plus $440,000 for government
oversight costs and the expense of soil remediation

American Cyanamid: $2.75 million (portion to settle state claims)
Olin Hunt: $2.75 million (portion to settle state claims)
Forty-seven non-carve-out parties: $7.2 million
UTC:        Remainder of settlement, approximately $2.8 million
            Soil remediation, estimated at $14 million
            (UTC contribution action recoveries to be split with the
            United States after deduction of attorneys' fees; UTC
            recovery capped at $5.364 million)

Consent Decree II: $4.135 million (part to U.S. and part to UTC)

Twenty-three non-carve-out parties: $4.135 million

Consent Decree III: $5 million (part to U.S. and part to UTC)

National Starch: $5 million

Consent Decree IV: $200,000 (part to U.S. and part to UTC)

Swan Engraving: $150,000

Power Semiconductors: $50,000

<u>Capuano Consent Decree</u>: $200,000

Capuano Brothers: $200,000

<u>Total from Partial Consent Decrees, Phase I and II</u>: approximately $33 million (not including interest on escrowed amounts)